UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| Xue (Heidi) Feng,<br><br>    Plaintiff,<br><br>vs.<br><br>NOMURA SECURITIES INTERNATIONAL,<br>INC.,<br><br>    Defendant. | Case No.  1:24-cv-467<br><br>**COMPLAINT** |

Plaintiff Xue (Heidi) Feng ("Ms. Feng" or "Plaintiff") by and through her attorneys, The

Law Office of Christopher Q. Davis, PLLC, alleges upon knowledge and information and belief:

## NATURE OF ACTION

1.     Upon information and belief, Defendant Nomura Securities International, Inc.

("Nomura" or "Defendant") is a male dominated organization where women are treated less

favorably and are paid substantially less than men.

2.     Defendant's European affiliate, Nomura International plc, ("Nomura EMEA") is

required to publish a "Gender Pay Gap Report." Nomura EMEA's report disclosed:



https://www.nomuraholdings.com/company/group/europe/pdf/2022_ukgpgr.pdf.

3.      In addition to disclosing that men are paid substantially more than women, Nomura EMEA publicly disclosed that it set a goal of having 19% female representation in senior management positions by 2022.  When it failed to meet this goal, Nomura changed its own target to 17% female representation in senior management by 2026.

(https://news.bloomberglaw.com/esg/nomura-relaxes-gender-target-thats-already-lower-than-peers).

4.      Upon information and belief, the entire Nomura global organization, including Defendant, are similarly male dominated and regularly treat women less favorably in all aspects of employment, including compensation.

5.      Ms. Feng was severely impacted by discrimination during her employment at Nomura.

6.      Ms. Feng's boss told her that she was "underpaid" relative to her male counterparts.

7.      In addition to being paid less than her male counterparts, Ms. Feng was disadvantaged in her employment because she is a woman.

2

8.      Defendant maintained a different set of rules for the men and women in Ms. Feng's department.  For example, Ms. Feng was disciplined for taking time away from the office to address health issues that are specific to women, while her male counterparts were not disciplined for choosing to work outside the office.

9.      Ms.  Feng complained about discrimination on multiple occasions.

10.     In July 2023 Ms. Feng responded to a Company survey by stating that the business unit where she worked "should stop discriminating against women."

11.     Just weeks later, Defendant terminated Ms. Feng as part of a so-called "Reduction in Force" that was targeted at Ms. Feng, the only woman employed on Defendant's Equities Digital Office NSI Team. Defendant terminated Ms. Feng in July 2023 but did not eliminate a single position in the Equities Digital Office NSI Team that was held by a man. Defendant's purported reduction in force was a pretext for discrimination and retaliation.

12.     Plaintiff brings this action against Defendant for monetary damages, interest, attorneys' fees, and costs suffered as a result of: (1) Defendant's violations of the Family and Medical Leave Act, 29 U.S.C. § 2601 et seq. ("FMLA"); (2) discrimination in compensation on the basis of sex in violation of the federal Equal Pay Act, 29 U.S.C. §§ 206 *et seq*. ("EPA"), and New York State Equal Pay Law, N.Y. Labor Law §§ 194 *et seq*. ("NYEPL"); and (3) disability and gender based discrimination and retaliation under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000 et seq. ("Title VII"), the New York State Human Rights Law, N.Y. Executive Law §§ 296 *et seq*., ("NYSHRL"), and Title 8 of the Administrative Code of the City of New York, §§ 8-107 et. seq. ("NYCHRL").

13.     Plaintiff now seeks back pay and benefits, front pay and benefits, compensatory and punitive damages, statutory penalties, attorneys' fees and costs, as well as declaratory and

injunctive relief for violations of Plaintiff's statutory rights and injuries Plaintiff has sustained as a result of Defendant's unlawful employment discrimination and unlawful retaliation for complaining about the same.

## PROCEDURAL REQUIREMENTS

14.     Following the commencement of this action, a copy of this Complaint will be served on the New York City Commission on Human Rights and the Office of Corporation Counsel of the City of New York, thereby satisfying the notice requirement of §8-502 of the New York City Administrative Code.

## JURISDICTION AND VENUE

15.     This Court has subject matter jurisdiction over this matter pursuant to 28 U.S.C. §§ 1331 and 1343 as this action involves federal questions regarding the deprivation of Plaintiff's rights under Title VII, the FMLA, and the Equal Pay Act.[1]

16.     This Court has personal jurisdiction over Defendant because the claims arose out of Defendant's contacts with New York and Defendant intentionally acted in such a way as to cause injury to Ms. Feng in the State of New York.

17.     This Court has supplemental jurisdiction over Plaintiff's state law claims brought under the NYSHRL, NYCHRL, and NYSEPL pursuant to 28 U.S.C. § 1367.

18.     Venue is proper in the United States District Court, Southern District of New York pursuant to 28 U.S.C. § 1391, because a substantial part of the events giving rise to these claims occurred in this district and because the Defendant does business in this District.

---

[1] Plaintiff is filing a charge with the Equal Employment Opportunity Commission and plans to amend her complaint after the EEOC issues a right to sue letter.

## PARTIES

19.     At all relevant times mentioned herein, Plaintiff is and was a resident of New York City. She was employed by Defendant between August 2020 and July 29, 2023.

20.     Defendant is a financial services firm headquartered and with a principal place of business at 309 West 49th Street New York, NY 10019-7316.

## FACTUAL ALLEGATIONS

21.     Ms. Feng was hired by Nomura in August 2020 as an Associate Quantitative Researcher based in its New York City office. Ms. Feng has a Doctorate in Economics from the University of Illinois. Prior to joining Nomura, she worked at JP Morgan Chase as a Quantitative Analyst.

22.     At the start of her employment, Ms. Feng reported directly to Roman Muchnik ("Mr. Muchnik"), who was the head of the Equity Derivatives Quantitative Team ("EDQ Team").

23.     Ms. Feng was the only woman on the EDQ Team. During her time on the EDQ Team, there were between 3 and 5 additional members of the Team, all of whom were men.

24.     In early 2021, while Ms. Feng was still on the EDQ Team, Roy Abhishek ("Mr. Abhishek") joined Nomura as IT lead. In her role, Ms. Feng needed to communicate with Mr. Abhishek on a regular basis. From the start of his employment, it was clear that Mr. Abhishek did not like or respect Ms. Feng. In weekly Webex meetings between the EDQ Team and IT, Mr. Abhishek would act aggressively and dismissively toward Ms. Feng. He would not refer to her by name, but would refer to her only as "her" to other meeting attendees. Mr. Abhishek did not act aggressively and dismissively toward Ms. Feng's male colleagues.

25.     After the fourth or fifth weekly EDQ Team-IT meeting, Ms. Feng complained to Mr. Muchnik about Mr. Abhishek's behavior. In response, Mr. Muchnik agreed to attend the weekly meeting, which he would not normally do. Mr. Muchnik witnessed Mr. Abhishek's behavior and agreed that Mr. Abhishek was being rude and dismissive towards Ms. Feng. Mr. Muchnik agreed to talk to Mr. Abhishek about his behavior. After Mr. Muchnik spoke with him, Mr. Abhishek began addressing Ms. Feng by name and his attitude toward her improved temporarily.

26.     In late 2021, Werner Stanzl ("Mr. Stanzl") became Ms. Feng's direct manager, reporting to Mr. Muchnik.

27.     In December 2021, Sergey Polgul ("Mr. Polgul") was hired as a VP of Equity Derivatives Quantitative Research on the EDQ Team. In April 2022, Ms. Feng was promoted to the same position as Mr. Polgul, VP of Equity Derivatives Quantitative Research, and her base salary increased from $160,000 to $200,000. She and Mr. Polgul both continued to report to Mr. Stanzl on the EDQ Team.

28.     Starting around April 2022, Nomura expanded from about 100 employees to about 130 employees. Among the new hires, females were only hired for analyst, associate, and VP level positions; only males were hired for the higher-level positions such as Managing Director positions. Simon Yates ("Mr. Yates") took over as Global Head of Equities. Mr. Yates assigned Michael Anthony ("Mr. Anthony") as head of the Global Equities Digital Office ("GED Team"), which was in a different reporting line than Mr. Munchik and the EDQ Team. All of Mr. Yates' direct reports, including new hires, were male Managing Directors.

29.     In October 2022, there was a reorganization within the company. The entire EDQ Team, from Mr. Stanzl down, were moved from the EDQ Team to the GED Team. Mr. Anthony

became Ms. Feng's supervisor above Mr. Stanzl. Ms. Feng and Mr. Polgul reported to Mr. Stanzl, who reported to Mr. Anthony, who reported to Mr. Yates.

30.     Ms. Feng was the only female member of the GED Team. Between November 2022 and February 2023, Mr. Anthony hired four more Analysts to the GED Team, all of whom were male. Three were hired for Executive Director-level roles (which is a higher-level role than Ms. Feng, who was a VP), and one was hired for an Associate level role.

31.     Though she had an equal or lower title, Ms. Feng was more qualified for her position than the other Analysts on the GED Team. Ms. Feng was able to use more sophisticated and accurate predictive models than Mr. Polgul, while the other Analysts were unable to directly use new predictive modeling at all.

32.     Despite having the same title, being more qualified, and having more seniority than Mr. Polgul, Ms. Feng learned that she was consistently paid less than Mr. Polgul during her employment with Nomura. Specifically, in early 2023, Ms. Feng spoke with Mr. Muchnik who directly told her that she was "underpaid." Mr. Muchnik was involved in the hiring of both Ms. Feng and Mr. Polgul and knew their salaries and the bonuses they had received.

33.     In her new role on the GED Team, Ms. Feng continued ongoing work on the "Earnings Volatility Project" which had a timeline to be completed before the end of 2022. However, the issues that she previously had with Mr. Abhishek returned.

34.     In October of 2022, in a weekly GED Team-IT meeting, an attendee asked about the Earnings Volatility Project. As she was working on that project, Ms. Feng attempted to respond, but Mr. Abhishek did not allow her to speak. He cut her off, saying, "Quant[2] speaks last

---

[2] Quant was another term for the GED Team

in these meetings." However, when Mr. Stanzl (also on the GED Team), spoke on the same topic without waiting until the end of the meeting, Mr. Abhishek raised no issue.

35.     On October 19, 2022, Ms. Feng talked to Mr. Anthony about Mr. Abhishek's aggressive and dismissive attitude toward her. She also mentioned that, as Mr. Abhishek's team generates and maintains the data that the GED Team relied on, she was concerned that his personal feelings toward her might be negatively impacting the data quality, which had been an ongoing issue. Further, Mr. Abhishek's team had been regularly ignoring or deprioritizing requests that Ms. Feng submitted. Ms. Feng informed Mr. Anthony that she had also discussed these issues with Debbi Herzig in Human Resources.

36.     In response, Mr. Anthony told Ms. Feng that he would talk to Mr. Abhishek or his manager. Later, Mr. Anthony let Ms. Feng know that he spoke to Mr. Abhishek and that he would closely monitor the situation going forward through regular meetings with IT to ensure that Mr. Abhishek's team was on track with the GED Team's requests and projects. He also told her and Mr. Stanzl that the GED Team should no longer have weekly meetings with IT directly and he would handle all interactions with the IT team.

37.     Despite his stated commitment to assist with the situation, Mr. Anthony did not follow through. He immediately went on vacation. There continued to be data quality issues and Ms. Feng's requests to IT continued to be ignored. As a result, Ms. Feng's ongoing projects were at risk of failing. She was concerned that this would impact the upcoming assessment of her performance. Ms. Feng spoke with Mr. Anthony again about the ongoing issues, and Mr. Anthony dismissed Ms. Feng's concerns, saying that Ms. Feng's requests are being deprioritized because Mr. Abhishek's team is very busy.

38.     On November 16, 2022, Ms. Feng arranged a meeting with Mr. Anthony, Mr. Muchnik, and another Managing Director, Jason Varano ("Mr. Varano") to discuss the ongoing problems. Mr. Varano suggested that Ms. Feng report her concerns to HR, which she then did. Mr. Varano also said that he would talk to Mr. Abhishek. Despite Ms. Feng's ongoing and persistent warnings that Mr. Abhishek's team was causing data quality issues which could negatively impact all of the GED Team's projects, Ms. Feng's supervisors, including Mr. Stanzl and Mr. Anthony, never addressed the situation.

39.     Following the November 16th meeting, Mr. Anthony was upset with Ms. Feng for involving Mr. Varano, who also reports directly to Mr. Yates, in the situation with Mr. Abhishek. In December of 2022, Ms. Feng arranged a meeting with Mr. Anthony to discuss his expectations of her in anticipation of her upcoming performance review. Following this meeting, Mr. Anthony emailed Ms. Feng a list of requirements and expectations. One requirement was that Ms. Feng be in person in the office on Tuesdays, Wednesdays, and Thursdays. Ms. Feng asked Mr. Anthony whether every person on the team received the same list of requirements, and he said "different people have different expectations." Later, Ms. Feng asked Mr. Polgul whether he had received a list of requirements, and he told her that he had never received such a list.

40.     These new requirements were a problem for Ms. Feng because, at that time, she was actively undergoing screenings and biopsies to address concerns that she may have skin and/or breast cancer. Due to her doctor's limited availability, she had appointments scheduled for December 12, 2022 (Thursday), January 26, 2023 (Thursday), and February 10, 2023 (Wednesday). Ms. Feng told Mr. Anthony that she had doctors' appointments on those days for screenings and biopsies. He told her that she would need to reschedule them to days that were not Tuesday, Wednesday, or Thursday.

41.     Ms. Feng contacted Ms. Herzig in HR about her doctors' appointments and Mr. Anthony's new in-office requirements. She explained that she had cancer screening and biopsies scheduled. She suggested that Ms. Feng inform Mr. Anthony about the specifics of the appointments to see if he would allow her to attend the appointments. Ms. Feng explained that she had already done this. Ms. Feng also told Ms. Herzig that other the members of the GED Team had not received a list of requirements like she had.

42.     Ms. Feng was unable to reschedule her doctors' appointments, and she attended them. Her Thursday, February 9th breast biopsy was scheduled for the afternoon. On February 8th, Ms. Feng spoke to Mr. Anthony in person to again tell him that she had the appointment the next day, and to ask that she be able to work from home in the morning. She also told Mr. Stanzl about the appointment. Mr. Anthony was not sympathetic; he told her that he wanted her to be in the office in the morning "in case he needed her."

43.     Given the urgency of the February 9th appointment and her doctor's inability to reschedule, Ms. Feng worked from home in the morning and attended the appointment in the afternoon. The process, which includes anaesthetization, radiology, two mammograms, the insertion of titanium into her breasts, and analysis by the doctor, took about 4 hours.

44.     On February 23, 2023, Ms. Feng spoke to Mr. Anthony about a 10-day vacation that she had planned from February 28 to March 10, 2023. Ms. Feng had already discussed this vacation with Mr. Stanzl about a month prior and gotten his approval. Mr. Anthony was clearly upset that Ms. Feng was taking a vacation.

45.     On February 24, 2023, Ms. Feng emailed Mr. Anthony and asked that she be able to work from home because she had an appointment with her psychiatrist later that day. In response, Mr. Anthony reprimanded her for giving "short notice" of her vacation and told her

"when not in an appointment, please ensure you are present in the building on the schedule of the rest of the team."

46.     Mr. Anthony's ongoing negative attitude about Ms. Feng's requests to work from home was confusing to Ms. Feng, because other individuals on the GED Team (all male), were regularly permitted to work from home without being questioned. For example, Mr. Polgul decided to work from home because the air quality was bad, and Mr. Anthony permitted him to do so. In the GED Team group chat or in person, the other Analysts openly discussed working from home on days that they needed to run errands or had doctors' appointments. During her time on the GED Team, even well into 2023, the male members of the GED Team were regularly permitted to work from home without issue.

47.     Ultimately, in March 2023, as a result of the ongoing data quality issues, Ms. Feng's "Earnings Volatility Project" project had a number of issues. Mr. Anthony told Ms. Feng that, because of the issues, her March 2023 performance review would be negative. Ms. Feng reminded Mr. Anthony that she had repeatedly and regularly informed him and Mr. Stanzl about the data quality issues which led to the problems with her project. Mr. Anthony became defensive, and he denied that Ms. Feng adequately informed him of the data quality issues. Ms. Feng showed Anthony the numerous emails in which she raised concerns.

48.     Mr. Stanzl conducted Ms. Feng's March 2023 performance review, and he gave her a negative review for reasons relating to the problems with the Earnings Volatility Project. He criticized her for failing to set up meetings with IT to address the ongoing data quality issues; however, following her complaints in October 2022, Mr. Anthony had explicitly told her that he would be meeting with IT exclusively and that the GED Team should no longer meet with IT.

49.    Mr. Stanzl also criticized Ms. Feng for not "giving enough context" when presenting her analyses to traders. However, Ms. Feng had been presenting to traders since she joined the firm, and she had never received this feedback from Mr. Stanzl. A Human Resources employee who attended the performance review agreed that Mr. Stanzl should have given this negative feedback previously if it was an issue.

50.    Lastly, Mr. Stanzl criticized Ms. Feng for not coming into the office from Tuesday through Thursday; however, other than the few doctors' appointments that she needed to attend, she had been in compliance with this "requirement."

51.    On April 3, 2023, Ms. Feng submitted a complaint to Ms. Herzig in HR about the unfair performance review. She stated that she was being retaliated against by Mr. Anthony for failing to reschedule her doctors' appointments. About two weeks later, Ms. Feng also spoke to Mr. Varano and complained about the unfair performance review, and told him that she had filed a complaint with HR. Two days later, Ms. Herzig contacted Ms. Feng and told her that she had heard she spoke with Mr. Varano. Ms. Herzig stated that she had investigated Ms. Feng's complaint, concluded that Mr. Anthony had not done anything wrong, and that Ms. Feng should focus on improving her performance.

52.    After she submitted the complaint, Mr. Anthony started treating Ms. Feng significantly worse than other members of the team and worse than he did before she submitted the complaint. While Mr. Anthony used to regularly initiate meetings and conversations with her, Mr. Anthony began avoiding communications with Ms. Feng. Ms. Feng was forced to set up meetings with him on her own, and he would regularly reject her meeting invites or fail to show up to meetings that she arranged. When she tried to speak with him in person, he would often act

coldly and cut the conversation short. On one occasion, Mr. Anthony told Ms. Feng not to attend a meeting that she had been invited to by another employee.

53.    Mr. Anthony treated Ms. Feng differently than the men on the GED Team. Everyone on the team, except for Ms. Feng, would have weekly one-on-one meetings with him. On one occasion, an on-site interview with a potential new Analyst was held, and the entire GED Team, except for Ms. Feng, was asked to attend. Mr. Anthony began requiring Ms. Feng to do more work to validate her data than he would require from the other team members.

54.    Mr. Anthony began transferring Ms. Feng's work to other employees. For example, in April 2023, for the first time ever, Mr. Stanzl took over a presentation that Ms. Feng had been working on. Mr. Anthony transferred a project that Ms. Feng was working on to the IT Team. Ms. Feng's project involving a code she was creating was taken over by another analyst on the GED Team.

55.    In early July 2023, the company asked employees to complete a survey about the work environment and to provide feedback about management. Ms. Feng, who was still the only woman on the GED Team, wrote "Global markets [which refers to the GED Team] should stop discriminating against women." She also submitted negative feedback about Mr. Anthony and Mr. Stanzl's management skills.

56.    On July 29, 2023, in a Zoom meeting, Ms. Herzig and Mr. Anthony notified Ms. Feng that she was terminated. They claimed that she was being terminated due to a reorganization within the company. Upon information and belief, no one else on the GED Team was terminated at that time. Upon information and belief, Nomura interviewed candidates for positions that are similar to the position that Ms. Feng held.

57.     As a result of the discrimination that she faced and her termination, Ms. Feng has suffered severe emotional distress. Around October 2022, she discussed with her therapist that she was experiencing gender discrimination, and she was diagnosed with anxiety and depression. After her termination, her symptoms have gotten worse. She now has trouble sleeping. She has needed to increase her visits to her therapist, and she has been prescribed a higher dose of her medication.

## COUNT I

### Gender Discrimination in Violation of Title VII

58.     Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

59.     Plaintiff was an "employee" within the meaning of Title VII.

60.     Defendant was Plaintiff's "employer" within the meaning of Title VII.

61.     Plaintiff is a woman and as such she belongs to a protected class under Title VII.

62.     Plaintiff is, and has been at all relevant times, qualified for her position at Nomura.

63.     Defendant discriminated against Plaintiff on the basis of her gender in violation of Title VII, by denying her the equal terms and conditions of employment, including but not limited to: imposing restrictions on her ability to work from home and not doing the same for her male counterparts, permitting ongoing discriminatory treatment by Mr. Abhishek, giving her an unfair performance review, paying her less than her male counterparts, excluding her but not her male counterparts from interviews with candidates, regularly communicating with her male counterparts but avoiding communications with her, and terminating her employment.

64.     Defendant's conduct as alleged herein, constitute unlawful employment practices and unlawful discrimination on the basis of Plaintiff's gender in violation of Title VII.

65.     Defendant knew of the discriminatory conduct engaged in by Mr. Abhishek, Mr. Stanzl, and Mr. Anthony and failed to take appropriate corrective action to prevent such conduct.

66.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, lost wages and benefits and harm to her career.

67.     As a direct and proximate result of Defendant's unlawful discriminatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, anxiety, sadness, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, for which she is entitled to an award of damages.

68.     Defendant's unlawful actions constitute malicious, willful, and wanton violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

## COUNT II

### Retaliation in Violation of Title VII

69.     Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

70.     Plaintiff engaged in protected activities under Title VII when she complained about discrimination against women by Defendant.

71.     Defendant knew about the protected activity.

72.     In response to Plaintiff's protected complaint, Defendant retaliated against Plaintiff by, *inter alia*, terminating her.

15

73.     Defendant had no valid business justification for the retaliatory actions taken against Plaintiff following her engagement in protected activity.

74.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, monetary and/or economic harm, for which she is entitled to an award of damages.

75.     As a direct and proximate result of Defendant's unlawful retaliatory conduct in violation of Title VII, Plaintiff has suffered, and continues to suffer, mental anguish and emotional distress, including but not limited to, depression, anxiety, sadness, emotional pain, suffering, inconvenience, loss of enjoyment of life, and other non-pecuniary losses, for which she is entitled to an award of damages.

76.     Defendant's unlawful and retaliatory actions constitute malicious, willful, and wanton violations of Title VII, for which Plaintiff is entitled to an award of punitive damages.

## COUNT III

### Retaliation for taking FMLA Protected Leave

77.     Plaintiff hereby repeats and re-alleges each and every one of the above allegations as if fully set forth herein.

78.     Plaintiff was an "employee" within the meaning of the FMLA.

79.     Defendant was Plaintiff's "employer" within the meaning of the FMLA.

80.     Plaintiff is, and has been at all relevant times, a qualifying individual who was entitled to FMLA leave.

81.     Defendant is, and has at all relevant times, been a covered employer under the FMLA.

16

82.     From approximately November 2022 through February 2023, Plaintiff exercised her right to take personal medical leave, in the form of attending doctors' appointments to screen for skin and breast cancer, for which she was qualified under the FMLA.

83.     Her supervisor's behavior toward her after Plaintiff exercised her right to take personal medical leave, and Defendant's failure to stop the retaliatory behavior, amounts to retaliation against Plaintiff for invoking her protected rights under the FMLA.

84.     Defendant's decision to terminate Plaintiff's employment was retaliation against Plaintiff for invoking her protected rights under the FMLA.

85.     Defendant's decision to terminate Plaintiff's employment for requesting and taking temporary medical leave for the treatment of her serious health condition amounts to a willful violation within the meaning of the FMLA such that Plaintiff is entitled to liquidated damages.

86.     As a direct result of Plaintiff's supervisor's behavior, Defendant's failure to stop that behavior, and Defendant's decision to terminate Plaintiff's employment, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, including monetary damages, compensatory damages, punitive damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

## COUNT IV

### Gender Based Pay Discrimination in Violation of the Federal Equal Pay Act
### 29 U.S.C. § 206

87.     Plaintiff hereby repeats and realleges each and every allegation in the preceding paragraphs as if set forth fully herein.

88.     Under the EPA, an employee within a protected class cannot be paid a wage at a rate less than the employee without the status of the same protected class in the same

17

establishment for performing the same job duties which require equal skill, effort and responsibility under the same working conditions.

89.     Plaintiff is a woman and as such, a member of a protected class under the EPA.

90.     Plaintiff was paid at a rate less than other employees outside the protected class despite performing the same job duties which require equal skill, effort and responsibility under the same working conditions.

91.     As set forth above, Defendant's actions in paying Ms. Feng less than her similarly situated male comparators was willful such that she is entitled to 100% liquidated damages.

92.     As a result of Defendant's unlawful and discriminatory conduct in violation of the EPA, Ms. Feng is entitled to monetary damages, liquidated damages, costs, and attorneys' fees.

## COUNT V

### Gender Discrimination in Violation of the NYSHRL
### (New York State Human Rights Law N.Y. Exec. Law §§ 296 et seq.)

93.     Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

94.     Plaintiff was an "employee" within the meaning of the NYSHRL.

95.     Defendant was Plaintiff's "employer" within the meaning of the NYSHRL.

96.     Plaintiff is a woman, and as such she belongs to a protected class under the NYSHRL.

97.     Plaintiff is, and at all relevant times, has been qualified for her position with Defendant.

98.     Plaintiff satisfactorily performed her duties.

99.     Defendant's conduct, as alleged herein, constituted unlawful discriminatory practices and unlawful discrimination on the basis of Plaintiff's gender in violation of New York State Human Rights Law N.Y. Exec. Law §§296, 296(1)(a).

100.     Particularly, Defendant subjected Plaintiff to disparate treatment and adverse employment actions on account of her gender by denying her equal terms and conditions of employment, including but not limited to: imposing restrictions on her ability to work from home and not doing the same for her male counterparts, permitting ongoing discriminatory treatment by Mr. Abhishek, giving her an unfair performance review, paying her less than her male counterparts, excluding her but not her male counterparts from interviews with candidates, regularly communicating with her male counterparts but avoiding communications with her, and terminating her employment.

101.     Defendant knew of the discriminatory conduct towards Plaintiff and yet failed to take immediate and appropriate corrective action to prevent such conduct; as such, Defendant is liable.

102.     As a direct and proximate result of the Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, including monetary damages, compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

## COUNT VI

**Disability Discrimination in Violation of the NYSHRL**
**(New York State Human Rights Law N.Y. Exec. Law §§ 296 et seq.)**

103.     Plaintiff hereby repeats and re-alleges each and every one of the above-referenced allegations as if fully set forth herein.

104.     Plaintiff was an "employee" within the meaning of the NYSHRL.

19

105.    Defendant was Plaintiff's "employer" within the meaning of the NYSHRL.

106.    Plaintiff is, and has been at all relevant times, a qualified individual with a disability and a record of a disability within the meaning of the NYSHRL.

107.    Plaintiff is, and has been at all relevant times, otherwise qualified for her position with Defendant; she was, and is, able to perform the essential functions of her position with a reasonable accommodation.

108.    Defendant was aware of Plaintiff's disability and Plaintiff disclosed her need for accommodation, namely, the ability to attend doctors' appointments and to work from home on days that she needed to attend the appointments.

109.    At all relevant times, Plaintiff requested accommodations for her disability that were reasonable within the meaning of the law.

110.    Under the law, Defendant cannot deny accommodations to disabled employees that it otherwise extends to other employees.  Here, the periodic work from home accommodation requested by Plaintiff was extended to other employees.

111.    Defendant's refusal to accommodate Plaintiff's disability constitutes disability discrimination in violation of the NYSHRL.

112.    Defendant knew of the discriminatory conduct towards Plaintiff and yet failed to take immediate and appropriate corrective action to prevent such conduct; as such, Defendant is liable.

113.    As a direct and proximate result of the Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, including monetary damages, compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

## COUNT VII

**Retaliation in Violation of the NYSHRL**
**(New York State Human Rights Law N.Y. Exec. Law §§ 296 et seq.)**

114.    Plaintiff hereby repeats and re-alleges each and every one of the above allegations as if fully set forth herein.

115.    Plaintiff was an "employee" within the meaning of the NYSHRL.

116.    Defendant was Plaintiff's "employer" within the meaning of the NYSHRL.

117.    The NYSHRL makes it an unlawful practice to retaliate against an employee for complaining about a discriminatory practice.

118.    Plaintiff participated in protected activity when she complained that her supervisor was treating her worse after she had requested a reasonable accommodation of her disability.

119.    Plaintiff also participated in a protected activity when she complained that the Company was discriminating against women.

120.    Shortly after Plaintiff made one of these complaints, Plaintiff's supervisor began treating her worse, and Defendant terminated Plaintiff's employment.

121.    Defendant retaliated against Plaintiff for complaining about discriminatory treatment by treating her worse and terminating her employment.

122.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages, including monetary damages, compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

## COUNT VIII

**Gender Discrimination in Violation of the New York City Human Rights Law
(Title 8 of the Administrative Code of the City of New York, §8-107 et seq. ("NYCHRL")**

123.    Plaintiff hereby repeats and re-alleges each and every one of the above allegations as if fully set forth herein.

124.    Plaintiff was an "employee" within the meaning of the NYCHRL.

125.    Defendant was Plaintiff's "employer" within the meaning of the NYCHRL.

126.    Plaintiff is a woman, and as such he belongs to a protected class under the NYCHRL.

127.    Plaintiff is, and at all relevant times, has been qualified for her position with Defendant.

128.    Plaintiff satisfactorily performed her duties.

129.    Defendant's conduct, as alleged herein, constituted unlawful discriminatory practices and unlawful discrimination on the basis of Plaintiff's gender in violation of the NYCHRL.

130.    Particularly, Defendant subjected Plaintiff to disparate treatment and adverse employment actions on account of her gender by denying her the equal terms and conditions of employment, including but not limited to: imposing restrictions on her ability to work from home and not doing the same for her male counterparts, permitting ongoing discriminatory treatment by Mr. Abhishek, giving her an unfair performance review, paying her less than her male counterparts, excluding her but not her male counterparts from interviews with candidates, regularly communicating with her male counterparts but avoiding communications with her, and terminating her.

131.    Defendant knew or should have known of the discriminatory conduct towards Plaintiff and yet failed to take immediate and appropriate corrective action to prevent such conduct; as such, Defendant is liable.

132.    As a direct and proximate result of the Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, including monetary damages, compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

## COUNT IX

**Disability Discrimination in Violation of the New York City Human Rights Law**
**(Title 8 of the Administrative Code of the City of New York, §8-107 et seq. ("NYCHRL")**

133.    Plaintiff hereby repeats and re-alleges each and every one of the above allegations as if fully set forth herein.

134.    Plaintiff was an "employee" within the meaning of the NYCHRL.

135.    Defendant was Plaintiff's "employer" within the meaning of the NYCHRL.

136.    Plaintiff is, and has been at all relevant times, a qualified individual with a disability and a record of a disability within the meaning of the NYSHRL.

137.    Plaintiff is, and has been at all relevant times, otherwise qualified for her position with Defendant; she was, and is, able to perform the essential functions of her position with a reasonable accommodation.

138.    Defendant was aware of Plaintiff's disability and Plaintiff disclosed her need for accommodation, namely, the ability to attend doctors' appointments and to work from home on days that she needed to attend the appointments.

139.    At all relevant times, Plaintiff requested accommodations for her disability that were reasonable within the meaning of the law.

23

140.     Under the law, Defendant cannot deny accommodations to disabled employees that it otherwise extends to other employees.  Here, the periodic work from home accommodation requested by Plaintiff was extended to other employees.

141.     Defendant's refusal to accommodate Plaintiff's disability constitutes disability discrimination in violation of the NYCHRL.

142.     Defendant knew of the discriminatory conduct towards Plaintiff and yet failed to take immediate and appropriate corrective action to prevent such conduct; as such, Defendant is liable.

143.     As a direct and proximate result of the Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer harm for which she is entitled to an award of damages, including monetary damages, compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

## <u>COUNT X</u>

**Retaliation in Violation of the New York City Human Rights Law
(Title 8 of the Administrative Code of the City of New York, §§ 8-107 et seq.)**

144.     Plaintiff hereby repeats and re-alleges each and every one of the above allegations as if fully set forth herein.

145.     Plaintiff was an "employee" within the meaning of the NYCHRL.

146.     Defendant was Plaintiff's "employer" within the meaning of the NYCHRL.

147.     The NYCHRL makes it an unlawful practice to retaliate against an employee for complaining about a discriminatory practice.

148.     Plaintiff participated in protected activity when she complained that her supervisor was treating her worse after she had requested a reasonable accommodation of her disability.

24

149.    Plaintiff also participated in a protected activity when she complained that the Company was discriminating against women.

150.    Shortly after Plaintiff made one of these complaints, Plaintiff's supervisor began treating her worse, and Defendant terminated Plaintiff's employment.

151.    Defendant retaliated against Plaintiff for complaining about discriminatory treatment by treating her worse and terminating her employment.

152.    As a direct and proximate result of Defendant's unlawful conduct, Plaintiff has suffered and continues to suffer harm for which he is entitled to an award of damages, including monetary damages, compensatory damages, reasonable attorneys' fees and costs, and any and all penalties and/or fines.

## COUNT XI

### Violation of the NYSEPL

153.    Plaintiff alleges and incorporates by reference the allegation in each of the preceding paragraphs.

154.    Under the NYSEPL, an employee within a protected class cannot be paid a wage at a rate less than the employee without the status of the same protected class in the same establishment is paid for substantially similar work.

155.    Plaintiff is a woman and as such, a member of a protected class under the NYSEPL.

156.    Plaintiff was paid at a rate less than other employees outside the protected class despite performing substantially similar work under similar working conditions.

157.     As a direct result of Defendant's violations of the NYSEPL, Plaintiff has endured significant damages and is entitled compensatory, punitive and treble damages, in addition to attorney's fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays that the Court enter judgment in her favor and against Defendant, containing the following relief:

1.     A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate Title VII as to Plaintiff

2.     A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the FMLA as to Plaintiff

3.     A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the EPA as to Plaintiff

4.     A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the NYSHRL as to Plaintiff

5.     A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the NYCHRL as to Plaintiff

6.     A declaratory judgment that the actions, conduct and practices of Defendant complained of herein violate the NYSEPL as to Plaintiff

7.     An award to Plaintiff for her actual damages in an amount to be determined at trial for lost wages and benefits, including an award of back pay and front pay;

8.     An award to Plaintiff of compensatory damages in an amount to be determined at trial for the emotional distress sustained by her;

26

9.     An award of punitive damages to deter future conduct by the Defendant, in an amount to be determined at trial;

10.    An award to Plaintiff of the costs of this action, including reasonable attorneys' fees and case expenses to the fullest extent permitted by law;

11.    Statutory fines and interest;

12.    Such other and further relief as the Court deems necessary and proper.

## **JURY DEMAND**

Plaintiff hereby demands a trial by jury on all issues of fact and damages stated herein.

Dated: January 22, 2024                    Respectfully submitted,
       New York, New York

                                           Brendan Sweeney
                                           Nicholas Bittner
                                           The Law Office of Christopher Q. Davis, PLLC
                                           80 Broad Street, Suite 703
                                           New York, New York 10004
                                           646-430-7930 (main)
                                           nbittner@workingsolutionsnyc.com