UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

Xue (Heidi) Feng,

           Plaintiff,

vs.

NOMURA SECURITIES INTERNATIONAL,
INC.,

           Defendant.

Case No.: 1:24-cv-00467-VEC

## DECLARATION OF XUE (HEIDI) FENG IN OPPOSITION TO DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

I, Xue (Heidi) Feng ("Plaintiff" or "Ms. Feng"), hereby declares as follows:

1.      I am the named plaintiff in this action.

2.      I make the following Declaration in opposition to the motion of Nomura Securities International, Inc. ("Defendant" or "Nomura") for summary judgment dismissing the Complaint.

**Background**

3.      I was employed at Nomura from on or about September 8, 2020 until August 4, 2023, when Nomura suddenly terminated my employment.

4.      During my employment at Nomura, I was a full-time Quant and my responsibilities included researching various market dynamics or models for use for valuation or for predicting various outcomes or analytics.

5.      I was initially assigned to the Equity Derivatives Team and reported to Roman Muchnik, the head of the Equity Derivatives Quantitative Team ("EDQ Team"). My base salary was $160,000 with a bonus of $60,000.

6.      I was the only female in the Equity Derivatives Office which included Matt Clark, Sergei Dzhosyuk, Werner Stanzl, Mathreya Sitaraman, and later, Sergey Polgul, who joined the team in January 2022.

7.      As a Quant Specialist at the Associate level in Nomura, I worked on the data analytics side of its Equity Trading Group and was responsible for, among other things, conducting quantitative research and building statistical models.

8.      I was responsible for, among other things, conducting quantitative research and analysis of equity market microstructure and the relationship between price dynamics in the cash equity market and transactions in the options market. I built models for price impact or transaction cost, average daily volume, and volume profiles.  I constructed hedging and conducted risk analysis in the Delta Impact Model and generated client reports based on the model's outputs. I also developed signals for trading strategies.

9.      I worked on several major projects such as the Earnings Volatility Prediction Model, the Delta Impact Model , the Volatility Signal Model, including the Implied Clean Volatility Prediction Model, the Realized Clean Volatility Prediction Model, the Surface Implied Volatility Project as well as the Factset Earnings Dates Project.

10.     During my employment at Nomura, I worked extensive hours.  My working hours mostly included after trading hours, especially after I was told to stop running my codes between the hours of 9:00-5:00 and so, I often had to run codes from 4 pm – 11 pm.

11.     In or about March 2022, I began to report to Werner Stanzl on the Equity Derivatives Team.

12.     I performed well and for my performance review in fiscal year 2022, I received a performance rating of "Meets Expectations."

13. On or about April 1, 2022, I was promoted to the position of Vice President. Both Mr. Muchnik and Mr. Stanzl supported my nomination for advancement to the position of Vice President.

14. Later in April 2022, Simon Yates ("Mr. Yates") took over as Global Head of Equities. Mr. Yates assigned Michael Anthony ("Mr. Anthony") as head of the Global Equities Digital Office ("GED Team"), which was in a different reporting line than Mr. Muchnik and the EDQ Team. All of Mr. Yates' direct reports, including new hires, were male Managing Directors.

15. In connection with my promotion, my base salary was increased to $200,000 and although I was to receive a bonus in the total amount of $165,000 which included deferred stock, I did not receive the full amount because I was terminated before it fully vested

16. Then, in or about October 2022, there was a reorganization within Nomura. Part of the EDQ Team (Mr. Stanzl's team) was moved to the GED Team, and I was one of those transfers. I continued to report to Mr. Stanzl, who reported to Mr. Anthony, who in turn reported to Mr. Yates.

17. I was the only woman employed on the GED Tean which consisted of me, Mr. Stanzl, Mr. Polgul, and Vikram Aggarwaal.

**Sergey Polgul and I Performed Substantially Similar Tasks**

18. Mr. Polgul and I were both Quants in the Equities Digital Office, we both held the same title of Vice President, and we performed substantially similar tasks.

19. Specifically, Mr. Polgul and I both built statistical models.

20. While Mr. Polgul had more years working than me, I had more relevant job experience than Mr. Polgul.

21.    I interviewed Mr. Polgul when he applied for a position at Nomura and reviewed his employment history.  The prior job experience Mr. Polgul described in his curriculum vitae and job application did not show experience in risk modeling in equity, equity portfolio, equity trading, equity portfolio algo trading including factor models of equity, equity index, ETF or equity portfolios, timing risk, transaction cost, price impact, market microstructure, portfolio optimization.  In comparison, I had experience in all of those areas which Mr. Werner acknowledged in the materials he submitted in support of my promotion.

**My First Two Complaints About Gender Discrimination and the Retaliation which Followed**

22.    During my employment at Nomura, I was severely impacted by discrimination, and I complained on multiple occasions about gender discrimination in the workplace.

23.    To begin with, Nomura is a male dominated organization where women are treated less favorably and are paid substantially less than men.

24.    In addition, I was treated differently from my male colleagues by Abhishek Roy, Team Lead and Executive Director of Nomura's Global Markets IT Team ("GMIT").

25.    I had to deal with Mr. Roy to perform my job duties since he controlled the data and production release that I needed for my projects.

26.    However, in my interactions with Mr. Roy, it was clear that Mr. Roy did not like or respect me- the only female quant.

27.    In weekly Webex meetings between the EDQ Team and IT, Mr. Roy would act aggressively and dismissively toward me, cut me off when I was speaking, and not let me speak. Also, he would not refer to me by name in meetings or communications but would refer to me with pronouns such as "her."

28.    Mr. Roy did not act the same way toward my male colleagues.

4

4931-0378-6162, v. 7

29.    In or about February 2022, I complained to Mr. Muchnik about Mr. Roy.

30.    I asked Mr. Muchnik to attend one of the meetings with quants and IT and in or about February 2022, he did.  In the meeting, Mr. Muchnik observed Mr. Roy interrupting me and told Mr. Roy, "let Heidi speak."

31.    Mr. Muchnik agreed to talk to Mr. Roy about his behavior and told me afterwards that he did.  Mr. Roy's conduct towards me improved temporarily.

32.    However, Mr. Roy began to withdraw the IT support I needed to perform my job.

33.    For example, in  May 2022, Mr. Roy failed to get data in production for me for the Enhancement of FactSet Earnings Dates Project he stated during one of the Quant-IT meetings he would work on .

34.    Also, in or about May 2022, Mr. Roy and his team started to deprioritize the Earnings Volatility Model that  I was working on as well as its release and in turn, prioritized Mr. Stanzl's project, the Vega Impact.

35.    I submitted various JIRA tickets and also emailed Mr. Anthony and other management, regarding the problem which led to issues with the Earnings Volatility Prediction Model I was working on and its implementation.

36.    By September 2022, I had made the Earnings Volatility Prediction Model available to release into production, and Mr. Werner stated that Nomura would release it at end of December 2022.

37.    However, Mr. Roy engaged in conduct which interfered with my ability to work on the Earnings Volatility Prediction model, after my complaint about him.

38.    On or about October 18, 2022, during a weekly GED Team-IT, I tried to address the issues regarding the Earnings Volatility Model in the meeting when an attendee asked about

the Earnings Volatility Project, but Mr. Roy did not allow me to speak.  Roy was dismissive, cut me off and did not let me speak.

39.    That same day, I sent an email to Mr. Roy complaining about his conduct and copied Mr. Muchnik, Mr. Stanzl and Jason Varano in the email.

40.    Roy "replied all" to my email, added Marina Voynova to the email, and stated that as a Quant,  my turn to speak was at the end. However, that was not true.

41.    Roy's conduct towards me was because I am a woman.  When Mr. Stanzl (also on the GED Team), spoke on the same topic without waiting until the end of the meeting, Mr. Roy raised no issue.  Also, when I later discussed the  matter with Mr. Stanzl, and informed him that Mr. Roy told me that, as a Quant, I can only speak last, Mr. Stanzl stated to me there was no rule that Quants can only speak at the end of the meeting.

42.    In that same email exchange with Mr. Roy on October 18, 2022,  Ms. Voynova tried to suggest that Mr. Roy did not hear me and that perhaps my line was muted; however, it was not.  In fact, when I discussed the matter with Mr. Stanzl, he acknowledged that he *did* hear me try to speak a few times in the meeting.  In addition, other attendees in the meeting said they heard my voice.

43.     While I attempted to seek help and support from Mr. Stanzl, he downplayed the situation.

44.    I also had a phone call with Human Resources presenting my complaint as hypothetical, because I feared retaliation.

45.    On the following day, October 19, 2022, during a meeting with Human Resources, I disclosed the identity of Mr. Roy in connection with my complaint about the discrimination.

46.     Then, on October 19th, I shared with Mr. Anthony my complaint about Mr. Roy's discriminatory behavior.

47.     I also explained to Mr. Anthony that because Mr. Roy's team generates and maintains the data that the GED Team relied on, I was concerned that his personal feelings toward me might be negatively impacting the data quality, which had been an ongoing issue.

48.     I discussed how Mr. Roy's team had been regularly ignoring or deprioritizing requests that I submitted.

49.     After I complained, Mr. Anthony told me that he would talk to Mr. Roy or his manager.

50.     Subsequently, he informed me that he spoke to Mr. Roy and that the GED Team would no longer have weekly meetings with IT directly.  I learned later that there were still meetings; however, I was not invited to attend them.

51.     Then, on November 14, 2022, I asked to have a meeting with Mr. Anthony, Mr. Muchnik, and another Managing Director, Jason Varano ("Mr. Varano") on November 16th to discuss Mr. Roy's conduct towards me which was different than how he treated other male quants and I attached copies of emails to show how Mr. Roy failed to address me by my name in certain communications.

52.     In the meeting, I complained that I was not receiving the support I needed from Mr. Roy and his team, I also complained about the data quality issues with Mr. Roy and the IT team as well as the fact  that Mr. Roy wanted to delete data from my project.  I explained that this kind of behavior probably would affect my project going forward and whether it was going to be implemented successfully.

53.    Following the November 16th meeting, Mr. Anthony was upset with me for involving Mr. Varano, who is senior to him, and also reports directly to Mr. Yates, on the matter involving Mr. Roy.

54.    He also issued a written memo of written expectations to me on that day.

55.    After my second complaint about Roy, I continued to experience data issues, and in fact, they became worse.

56.    I reported these data issues to Mr. Werner and Mr. Anthony through emails, chats, and also submitted JIRA tickets.

57.    Despite my ongoing and persistent warnings that Mr. Roy's team was causing data quality issues which could negatively impact all of the GED Team's projects, my supervisors, including Mr. Stanzl and Mr. Anthony, never addressed the situation.

58.    In March 2023, IT said it could not release the Earnings Volatility Prediction Model into production.

59.    Then, on or about March 15, 2023, I had a discussion with Michael Anthony wherein he told me that the performance of the Earnings Volatility Prediction Model was not good.  I explained that it's a data issue that I had already pointed out and I showed him the emails where I raised the data quality issues in which I complained that certain JIRA tickets had not been resolved.  I also mentioned that he previously told me that I would no longer attend the weekly GED Team-IT meeting where I would normally address those issues.

**Mr. Anthony's Unfair Focus on My In Office Presence, Interference with the Scheduling of My Medical Appointments and My Requests to Work Remotely, and the Retaliation Which Followed After I Complained**

60.    As I mentioned above, during my employment at Nomura, I worked long hours, sometimes 10, 12, 14 hour days.  I worked remotely and in-person.

61.     I was not the only one who worked remotely and my colleagues worked remotely quite frequently.  In fact, Mr. Polgul was fully remote up until at least November 2022, when he was on Mr. Anthony's team.

62.     Since I was dedicated to my job, if I was sick or had a medical appointment, I would still work remotely and advised my supervisor of same.

63.     While on Mr. Muchnik's team, there was no issue with my working remotely.

64.     When I was on Mr. Anthony's team, he did not tell me that there would be any disciplinary action taken or that my performance review would be impacted if I did not work in person on Tuesdays, Wednesdays and Thursdays.

65.     In or about September 2022,  I had a cancer scare and had medical appointments to attend in connection with same.

66.     On or about November 9, 2022, I informed Mr. Anthony of my November 10th doctor's appointment and also informed him that I may have follow-up doctors' appointments after the November 10th visit.

67.     Mr. Anthony told me not to schedule my medical appointments for a Tuesday, Wednesday or Thursday, and if I had an appointment on one of those days, I was to be in the office when I was not at my appointment.

68.     I tried to schedule appointments on Monday or Friday as he suggested.  For example, I scheduled an appointment with the dermatologist on Monday, December 12, 2022.

69.     However, as I was actively undergoing screenings and biopsies to address concerns of skin and/or breast cancer, due to my doctor's limited availability, I had appointments scheduled for Wednesday, December 14, 2022, Thursday, January 26, 2023, and Thursday, February 9, 2023.

I met with Mr. Anthony in person and told him that I had doctors' appointments on those days for screenings and biopsies.

70.    On December 14, 2022, and January 26, 2023, I was  not able to come into the office before or after my doctors' appointments and worked remotely. The appointments on those dates involved radiology and mammogram procedures, which required me to remove my clothing and undergo physically uncomfortable imaging procedures.

71.    One of the appointments was scheduled in the morning (expected to last from 10:00 am-12:00 Noon) and was located in the Wall Street area. The traveling back and forth and changing in and out of my business attire would have consumed substantial time, especially  due to traffic conditions and the use of public transportation.  It was more productive to spend the time working on Nomura projects at home rather than spending the time commuting back and forth and changing clothing.

72.    Then, on February 8, 2023, I spoke with Mr. Anthony in person to tell him that I had an afternoon appointment on February 9th for a biopsy and requested to work from home in the morning.  I had received pre- and -post procedure instructions from  medical staff, including what to wear, and was told that I had to use ice packs afterward.

73.    The process, which includes anesthesia, radiology, two mammograms, the insertion of titanium into my breasts, and analysis by the doctor, took about 4 hours.

74.    Notwithstanding the stress regarding the procedure, on February 9, 2023, the day of my biopsy, I worked nine and a half hours.

75.    Then on or about March 22, 2023, I met with Mr. Anthony to discuss my performance review and the discussion included, *inter alia*, the Earnings Volatility Model.

76.    I sent emails to Mr. Anthony which detailed my response to the purported performance issues that I disagreed with.  I also reminded him that I had repeatedly and regularly informed him and Mr. Stanzl about the data quality issues which led to the problems with the project.

77.    Shortly thereafter, on March 31, 2023, I received my performance rating and for the first time, was rated as "Partially Meets Expectations."  A few months prior, I had been rated by Mr. Stanzl as "Meets Expectations" for my mid-year review.

78.    I complained to both Mr. Anthony and Mr. Varano about the unfairness of the review.

79.    Also, on April 3, 2023, I submitted a complaint to Ms. Herzig in HR about the unfair performance review. I explained that it was unfair and also that I was being retaliated against by Mr. Anthony for failing to reschedule my doctor's appointments.

80.    Ms. Herzig set up a meeting with me on April 13, 2023, but then Mr. Anthony scheduled a group meeting to be held at the exact same time, so I asked to postpone the meeting to the following week.

81.    Without meeting with me, Ms. Herzig made her decision two weeks later and stated that she had investigated my complaint against Mr. Anthony of retaliation and concluded that Mr. Anthony had not done anything wrong.

82.    After my complaint against Mr. Anthony regarding his retaliatory conduct, Mr. Anthony started treating me significantly worse than other members of the team.

83.    For example, while Mr. Anthony used to regularly initiate meetings and conversations with me, Mr. Anthony began avoiding communications with me. I was forced to set up meetings with him on my own, and he would regularly reject my meeting invites or fail to show

up to meetings that I arranged.  I even complained to Mr. Anthony that it had been four months since we had our last one-on-one meeting.

84.    Also, Mr. Anthony began transferring my work to other employees. For example, in April 2023, for the first time ever, Mr. Stanzl took over a presentation that I had been working on.

85.    By the end of July, Mr. Anthony had transferred all of my work to Mr. Stanzl, Mr. Polgul, and Mr. Aggarwal.

86.    Mr. Anthony also transferred a project that I was working on to the IT Team.

**My Third Complaint About Gender Discrimination and My Ultimate Termination**

87.    In early July 2023, Nomura asked employees to complete a survey about the work environment and to provide feedback about management.

88.    I complained that "Global Markets Equities Team [which refers to the GED Team] should stop discriminating against women." I also submitted negative feedback about Mr. Anthony and Mr. Stanzl's management skills.

89.    While I had not named any one specifically, and had not disclosed my identity, my statements could reasonably be attributed to me as I was the *only* woman on the Global Markets Equities Team and the only person who had complained about gender  discrimination in the Global Markets Equities Team; in fact, I had complained twice.

90.    Also, I had received an email prior to my submission informing me that I had not yet responded to the survey and instructing me to complete same.

91.    A few weeks later, on July 28, 2023, I was asked to attend a virtual meeting with Ms. Herzig and Mr. Anthony.  In that meeting, Nomura terminated my employment.

92.    The reason given to me by Mr. Anthony during the meeting was a reduction in force.

93.    In addition, on the U-5 form, in the section, "Termination Reason," Nomura stated the reason for my termination was a "restructuring."

94.    I was never informed that my termination was due to any performance issues.

95.    After my termination, Mr. Muchnik provided me with a letter of recommendation praising me as a Quant .

96.    Based upon the foregoing, I respectfully request that the Court deny summary judgment in favor of Defendant dismissing the Complaint.


I declare under penalty of perjury that the foregoing is true and correct.

Executed in New York, New York, on this 5th day of June 2026.

_____
Xue (Heidi) Feng

13