UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------X

Xue (Heidi) Feng,                                  :
                                                   :
                        Plaintiff,                 :        Case No. 1:24-cv-00467-VEC
                                                   :
            -against-                              :
                                                   :
Nomura Securities International, Inc.,             :
                                                   :
                        Defendant.                 :
                                                   :
------------------------------------------------------------X


## PLAINTIFF'S MEMORANDUM OF LAW IN IN OPPOSITION TO DEFENDANT'S <u>MOTION FOR SUMMARY JUDGMENT</u>


Steven J. Hyman, Esq.
Jacqueline C. Gerrald, Esq.
**McLAUGHLIN & STERN, LLP**
260 Madison Avenue
New York, New York 10016
Telephone: (212) 448-1100
shyman@mclaughlinstern.com
jgerrald@mclaughlinstern.com

*Attorneys for Plaintiff Xue (Heidi) Feng*

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ................................................................................................ i

PRELIMINARY STATEMENT ....................................................................................... 1

STATEMENT OF FACTS ............................................................................................... 4

    Plaintiff's First Complaint Against Abhishek Roy ............................................... 4

    Ms. Feng is Promoted to VP ............................................................................... 5

    Creation of the Equity Digital Office ................................................................... 5

LEGAL ARGUMENT ...................................................................................................... 7

    I.    SUMMARY JUDGMENT STANDARD ............................................... 7

    II.    PLAINTIFF'S CLAIMS OF GENDER DISCRIMINATION SHOULD
        NOT BE DISMISSED ............................................................................ 8

        A.    Plaintiff Has Established a Prima Facie Case of Discrimination
            Under Title VII, the NYSHRL, and NYCHRL ..................................... 9

        B.    The Proffered Non-Discriminatory Reason for Ms. Feng's Termination
            is Pretextual ......................................................................................... 11

            1.    Nomura's Expansion of the EDO Through the Hiring and Transferring
                of Male Employees into the EDO After Ms. Feng's Termination
                Gives Rise to Discrimination ......................................................... 12

            2.    The Comments in Ms. Feng's Performance Review Regarding Data
                Issues Are Contradicted by Stanzl's Testimony and Such Contradictions
                Give Rise to an Inference of Discrimination ................................. 14

            3.    The Poor Performance Review was the Culmination of a Pattern of
                Discrimination ............................................................................... 15

    III.    PLAINTIFF'S CLAIMS OF GENDER BASED DISCRIMINATION IN
        COUNTS IV AND IX FOR VIOLATIONS OF THE FEDERAL EQUAL
        PAY ACT AND THE NYS EQUAL PAY ACT, SHOULD NOT
        BE DISMISSED .................................................................................. 18

        A.    Ms. Feng and Polgul Performed Equal Work on Jobs Requiring Equal Skill,
            Effort, and Responsibility .................................................................. 18

        B.    Nomura's Proffered Factor Other Than Sex Defense Is Unsupported and
            Contradicted, Raising Triable Issues of Fact ..................................... 20

IV.    PLAINTIFF'S CLAIMS OF RETALIATION SHOULD NOT BE
       DISMISSED ......................................................................................................22

    A.    The Causal Connection is Established Based on the Series of Antaganism
          and Deprioritization Leading to Ms. Feng's Performance Review ......................22

    B.    Nomura's Proffered Non-Retaliatory Legitimate Reason Is Undermined
          by the Actions of Anthony, Roy and Stanzl following her Complaints ...............24

    C.    Ms. Feng's Retaliation Complaint Against Anthony is a Viable Complaint ........27

CONCLUSION ...............................................................................................................28

## TABLE OF AUTHORITIES

**Cases**

*Aldrich v. Randolph Cent. School Dist.*,
  963 F.2d 520 (2d. Cir. 1992 .........................................................................................21

*Bart v. Golub Corp.*,
  96 F. 4th 566 (2d Cir. 2024)...........................................................................................8

*Belfi v. Prendergast*,
  191 F.3d 129 (2d Cir. 1999)..................................................................................passim

*Bucalo v. Shelter Island Union Free School Dist.*,
  691 F.3d 119 (2d Cir. 2012).........................................................................................25

*Chan v. NYU Downtown Hosp.*,
  2004 U.S. Dist. LEXIS 1419 (S.D.N.Y. 2004) ...........................................................24

*Conforti v. Sunbelt Rentals, Inc.*,
  201 F. Supp 3d 278 (E.D.N.Y. 2016) ...........................................................................13

*Curcio v. Roosevelt Union Free Sch. Dist.*,
  2012 U.S. Dist. LEXIS 120144 (E.D.N.Y. Aug. 22, 2012)....................................25, 27

*Dotson v. City of Syracuse*,
  763 Fed. Appx. 39 (2d Cir. 2019) ................................................................................11

*Downes v. JP Morgan Chase & Co*,
  2006 U.S. Dist. LEXIS 13582 (S.D.N.Y. Mar. 21, 2006) ......................................18, 20

*EEOC v. Port Auth. Of N.Y. & N.J.*, 7
  68 F.3d 247 (2d Cir. 2014)...........................................................................................19

*Giscombe v. New York City Dep't of Educ.*,
  39 F. Supp. 3d 396 (S.D.N.Y. 2014) ............................................................................22

*Graham v. Long Island R.R.*,
  230 F. 3d 34 (2d Cir. 2000)............................................................................................8

*Howard v. Sprint/United Mgmt. Co.*,
  299 F. Supp. 2d 180 (S.D.N.Y. 2003) ............................................................................7

*Kachmar v. SunGard Data Systems, Inc.*,
  109 F.3d 173 (3d Cir. 1997)..........................................................................................24

*Kemp v. Regeneron Pharms, Inc.*,
  117 F. 4th 63 (2d Cir. 2024) .........................................................................................27

*Lefort v. Kingsbrook Jewish Med. Ctr.*,
203 A.D. 708 (2d Dep't. 2022) ...................................................................................12

*Littlejohn v. City of New York*,
795 F. 3d 297 (2d Cir. 2015).....................................................................................13

*Mazzella v. RCA Global Communications, Inc.*,
642 F. Supp. 1531 (S.D.N.Y. 1986) ................................................................... 19, 20

*Moll v. Telesector Res. Grp., Inc.*,
94 F. 4th 218 (2d Cir. 2024) .....................................................................................21

*Osekavage v. Sam's East, Inc.*,
619 F. Supp 3d 379 (S.D.N.Y. 2022) ................................................................. 13, 17

*Owens v. Circassia Pharms., Inc.*,
33 F. 4th 814 (5th Cir. 2022) ....................................................................................24

*Radwan v. Manuel*,
55 F. 4th 101 (2d Cir. 2022) .......................................................................................8

*Sherman v. County of Suffolk*,
71 F. Supp. 3d 332 (E.D.N.Y. 2014)..........................................................................28

*Tomka v. Seiler Corporation*,
66 F.3d 1295 (2d Cir. 1995)......................................................................................19

*Triola v. Snow*,
289 Fed. Appx. 414 (2d Cir 2008) .............................................................................27

## Statutes

29 U.S.C. § 211c .........................................................................................................9

Plaintiff XUE (HEIDI) FENG ("Ms. Feng" or "Plaintiff") submits this memorandum of law in opposition to the motion of Defendant NOMURA SECURITIES INTERNATIONAL INC. ("Nomura" or "Defendant"), for summary judgment dismissing the Second Amended Complaint ("SAC").  For the reasons set forth herein, Defendant's motion should be denied in its entirety.

## PRELIMINARY STATEMENT

Plaintiff filed this action seeking, inter alia, monetary damages suffered as a result of: (1) gender based discrimination and retaliation under Title VII of the Civil Rights Act of 1964, the New York State Human Rights Law and the New York City Human Rights Law; (2) discrimination in compensation on the basis of sex, in violation of the federal Equal Pay Act and, the New York State Equal Pay Act, and (3) Retaliation under the Lawful Absence Law.

During her employment at Nomura, Ms. Feng was subjected to disparate treatment, retaliation, and unequal pay compared to her male counterparts. In 2022, she made two discrimination complaints against Abishek Roy 'ROY", a senior member of Nomura's Global Markets IT team. Those complaints triggered a campaign of retaliation by her supervisors and senior management.

After Ms. Feng's second complaint, Roy expressed his displeasure with her complaints to her direct supervisor, Werner Stanzl ("Stanzl"), who immediately relayed that information to Michael Anthony ("Anthony"), head of the EDO. What followed was a coordinated effort to target Ms. Feng, culminating in a sham "Partially Meets Expectations" review and her eventual termination under the pretext of a reduction in force ("RIF").

Anthony admitted he lacked substantive knowledge of the work performed Ms. Feng in his group when he assumed leadership of the EDO. Yet immediately after learning that Roy was upset with Ms. Feng, Anthony began imposing performance "expectations" on her. None of her

male colleagues in her group received similar scrutiny. The only employee singled out was Ms. Feng, the sole female employee who had complained about Roy.

Following her October 2022 complaint, Ms. Feng was excluded from weekly IT meetings, her concerns about IT issues were ignored, and projects assigned to her were repeatedly deprioritized by management. Stanzl and Anthony then used the resulting delays against her in her 2023 performance review, leading to her first-ever rating "Partially Meets Expectations."

The retaliation extended beyond her work assignments. Anthony selectively enforced his purported in-office attendance policy against Ms. Feng while permitting male employees to work remotely, leave early, and take sick days, personal days and vacation days without issue. When Ms. Feng required time for biopsies and medical appointments during a breast cancer scare, Anthony did not offer accommodations. Instead, he inquired of Human Resources what could be done if her absences from the office due to medical appointments became a "theme." The evidence shows that the decision-makers responsible for the purported RIF had already set their sights on terminating Ms. Feng well before the reduction in force was announced.

The record further shows that by March 2023, Stanzl, Anthony, and Human Resources representative Debbie Herzig ("Herzig") had been actively building the paper trail to justify Ms. Feng's termination. Herzig went so far as to edit comments concerning Ms. Feng's performance to minimize Ms. Feng's accomplishments and future potential. More tellingly, despite years of feedback describing Ms. Feng as merely shy, Herzig abruptly recast her as disruptive and acknowledged that a plan to terminate her existed before any purported reduction in force. This evidence alone undermines Nomura's claimed justification and reveals the retaliatory motive behind Ms. Feng's termination.

Nomura's treatment of Ms. Feng's health issues further exposes its discriminatory animus. Despite knowing she was undergoing radiological exams and biopsies when dealing with breast cancer scares, Anthony never discussed with Feng any workplace accommodations. Instead, he characterized her medical appointments as a recurring problem or in his words a "theme". Rather than accommodate Ms. Feng's medical needs, Nomura weaponized them and ultimately used them as part of the basis for her termination. Anthony, Stanzl and Herzig all participated in the performance review of Ms. Feng when she was rated as "Partially Meets Expectations." Thene when she complained that the performance rating was unfair and retaliatory, her retaliation complaint received no meaningful investigation. Instead, Herzig simply ratified the performance review she helped draft and quickly concluded that there was no retaliation. When Ms. Feng responded to a company survey stating that the group within which she was employed as the sole female, "should stop discriminating against women," she was terminated a mere two weeks later. The purported reason given to Ms. Feng for the termination of her employment was a "reduction in force."

Taken together, the actions of Roy, Stanzl, Anthony, and Herzig present compelling evidence of discrimination and retaliation by Nomura's senior management. At the very least, summary judgment is inappropriate because the record contains material triable issues of fact regarding pretext, including, but not limited to: (a) shifting explanations for Ms. Feng's termination; (b) contradictory testimony concerning her performance and reviews; (c) Nomura's admission that Ms. Feng was underpaid relative to applicable pay standards; (d) Herzig's acknowledgment that a termination plan existed before the RIF; (e) Anthony's targeting of Ms. Feng for attending medical appointments; (f) Anthony's sudden imposition of heightened expectations immediately after learning Roy was upset with her complaints; (g) the selective

3

review of Ms. Feng's office attendance records without comparable review of a single male employee; and (h) comments by senior management and Human Resource representatives dismissing both her viable complaints and legitimate medical needs. A reasonable jury could conclude that Nomura's stated reasons for terminating Ms. Feng were pretextual and that discrimination and retaliation were the true motivating factors. As such, Nomura's summary judgment motion should be denied in its entirety.

### STATEMENT OF FACTS[1]

Ms. Feng commenced her employment at Nomura on or about September 8, 2020 as an Associate level Quant Specialist within Nomura's Equity Trading Group ("ETG"). (PSOF ¶ 24). Upon her hiring Ms. Feng received a base salary of $160,000 (PSOF ¶ 34). At the time of her hire, Plaintiff was assigned to the Equity Trading Group. (PSOF ¶ 24).

Within the Equity Trading Group, Ms. Feng reported directly to Muchnik. (PSOF ¶ 26). For the majority of Nomura's fiscal year 2022, Plaintiff reported to Muchnik until Stanzl became Plaintiff's direct supervisor in or around March of 2022. (PSOF ¶ 41).

In January of 2022, the Equity Trading Group expanded with the addition of a new male "junior quant" Vice President with the hire of Sergey Polgul ("Polgul"). Ms. Feng and Polgul were both considered "junior" quants. (PSOF ¶ 75). Ms. Feng and Polgul both built statistical models during their time within the Equity Trading Group. (PSOF ¶ 84).

**Plaintiff's First Complaint Against Abhishek Roy**

As a quant within Nomura, Ms. Feng collaborated with the IT team because the IT team controls the data for models. (PSOF ¶¶ 89;91). Abishek Roy ("Roy") was a senior member of the IT team. (PSOF ¶ 90). In or around February of 2022, Ms. Feng made a report to Muchnik,

---

[1] A more detailed statement of facts is contained in Plaintiff's Statement of Material Facts Pursuant to Rule 56.1 ("PSOF").

her direct supervisor, regarding Roy not referring to Plaintiff by name and acting disrespectfully towards her as opposed to how he treated the other male employees.  (PSOF ¶ 92-94).

Some time before her 2022 fiscal year end review, Stanzl became Ms. Feng's direct supervisor. (PSOF ¶ 41).  Ms. Feng's 2022 fiscal year performance review took place in March of 2022 and Ms. Feng received a grade of "meets expectations"  (PSOF ¶ 45).

**Ms. Feng is Promoted to VP**

Following her March 2022 Review, Muchnik, with the help of Stanzl suggested that Ms. Feng be up for promotion to Vice President ("VP").  (PSOF ¶ 56-57).  Ms. Feng was promoted to VP in April of 2022 (PSOF ¶ 60).  Ms. Feng received a base salary of $200,000 after her promotion.  (PSOF ¶ 61).  During her employment with Nomura, Plaintiff was paid less than her male counterparts as admitted to by Anthony and Herzel.  (PSOF ¶ 267, 269).

**Creation of the Equity Digital Office**

In or about October 2022, Nomura created the Equity Digital Office ("EDO"). (PSOF ¶ 78). Ms. Feng was transferred to the EDO along with Stanzl, Polgul and Vikram Aggarwal. (PSOF ¶ 80).  Michael Anthony ("Anthony") was named the Head of Nomura's EDO.  (PSOF ¶ 79).  Ms. Feng continued to directly report to Stanzl.  (PSOF ¶ 81-82).

After the creation of the EDO, the Quants in the EDO would have joint meetings with the IT team, headed by Roy.  (PSOF ¶ 92).  These joint meetings were required because Roy and his team would need to deploy the models could impact the data that a Quant could access. (Muchnik, p. 32:11-33:4).  On October 18, 2022 (the "October 18 Meeting"), Ms. Feng was still experiencing data issues due to the lack of response from the IT team, and there was a joint meeting held between the Quants and the IT team.  (PSOF ¶ 92).  At the meeting, Roy interrupted Ms. Feng and would not let her speak until last.  (PSOF ¶ 100).

Following the October 18 Meeting, Ms. Feng sent an email to Roy indicating the issues she wanted to bring up during the October 18 Meeting.  (Gerrald Decl., Ex. EE).  Subsequently to alerting Roy, Muchnik, Anthony, Stanzl and Jason Varano ("Varano") to the data issues and discriminatory treatment of her by Roy, Ms. Feng contacted Debbie Herzig ("Herzig") of the Human Resources Department (the "October Complaint").  As a result of her October Complaint, Anthony informed Ms. Feng that he had spoken with Roy and as a result he would no longer be requiring joint meetings between the IT team and quants in his group, leaving only Stanzl and Anthony to attend meetings with IT. (PSOF ¶¶ 116; 119).  Anthony then was not in the office for a vacation, returning to the office on October 31, 2022 (Gerrald Decl., Ex EE).

Upon Anthony's return to the office, Stanzl informed Anthony that Roy was upset about Ms. Feng's emails.  (Gerrald Decl., Ex. FF).  Within a week of learning that a senior member of the IT team, was upset with Ms. Feng, Anthony, began drafting a written set of expectations for Ms. Feng on or about November 9, 2022.  (Gerrald Decl., Ex. GG).  On November 14, 2022, Ms. Feng emailed Anthony regarding upcoming medical tests.  (Gerrald Decl., Ex. II).  Shortly after receipt, Anthony forwarded the email to Herzig asking "if this becomes a theme, what can I do on this?".  (Gerrald Decl., Ex. JJ).  Anthony, five hours after forwarding the email to Herzig, responded to Ms. Feng stating "that's fine, I'll call you instead.".  (Gerrald Decl.,  Ex. JJ).  Two days later, Anthony emailed Ms. Feng a written set of expectations.  (Gerrald Decl., Ex. KK).  Feng, the only female employee on an all male team, was the only person who received a written document of expectations. (Anthony Dep., p. 216:9-217:9).

Following the October Complaint, over the course of the next few months, Ms. Feng routinely followed up with the IT team to address the issues she was facing, and was routinely deprioritized or unresponded to.  (Stanzl Dep., p. 93:23-99:13). Ms. Feng created JIRA tickets

and informed her supervisors of her issues, yet, despite Stanzl admitting that quant projects were the highest priority, Stanzl did not bring up Ms. Feng's data issues during the IT meetings. (Stanzl Dep., p. 95: 12-20).

Anthony and Herzig then requested Ms. Feng's in office attendance records or "swipes" on January 10, 2023.  (Gerrald Decl., Ex. LL). A second request for Ms. Feng's swipes was made on February 14, 2023.  (Gerrald Decl., Ex. LL).  Anthony did not request that Human Resources pull swipes for any other members of his team.  (Anthony Dep., p. 175:12-176:8).

Anthony and Stanzl made the determination to give Ms. Feng a "partially meets expectations" review for fiscal year 2023.  (Murphy Decl. Ex. SS).  In June of 2023, Herzig indicated that there was already a plan in place to terminate Ms. Feng, regardless of a RIF. (Murphy Decl., Ex. AA).

Ms. Feng's termination was effective August 4, 2023 and she was informed that it was due to a reduction in force (PSOF ¶ 293-294).

## **LEGAL ARGUMENT**

### I.     **SUMMARY JUDGMENT STANDARD**

On a summary judgment motion, the evidence is viewed in the light most favorable to the non-moving party and the Court must draw all reasonable inferences in the non-moving party's favor.  *Howard v. Sprint/United Mgmt. Co.*, 299 F. Supp. 2d 180, 187 (S.D.N.Y. 2003).  The proponent of such a motion, bears the burden of establishing that no "genuine issue of material" fact exists and is an inappropriate remedy "if there is evidence in the record as to any material fact from which an inference could be drawn in favor of the non-movant."  The Second Circuit has routinely noted that courts must be "especially cautious" in deciding a summary judgment motion and granting the "drastic remedy" in a discrimination case "because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference

of discrimination.  (*Id.*)(internal citations omitted).  Because the discriminatory acts are often 'hidden under a veil of self-declared innocence,' a discrimination victim is 'seldom able to prove his or her claim by direct evidence and is usually constrained to rely upon the cumulative weight of circumstantial evidence." *Id.* (internal citations omitted).

Here, as further discussed below, when viewing the evidence collectively, rather than standing alone as Nomura attempts to do, the evidentiary record establishes the discrimination, unequal pay and retaliation suffered by Ms. Feng at the hands of Nomura.

## II. PLAINTIFF'S CLAIMS OF GENDER DISCRIMINATION SHOULD NOT BE DISMISSED

In order to establish a prima facie case of gender discrimination under Title VII, a plaintiff must prove the following four elements: (1) the plaintiff was within a protected class; (2) the plaintiff was qualified for the position; (3) the plaintiff was subject to an adverse employment action; and (4) the adverse action occurred under circumstances giving rise to an inference of discrimination. *Bart v. Golub Corp.*, 96 F. 4th 566, 570 (2d Cir. 2024).

Nomura concedes that Ms. Feng has established the first three factors, and its challenge to the fourth in unavailing.  To establish the fourth factor, Plaintiff must show (i) that the employees were subject to the same performance evaluation and discipline standards, and (ii) that the similar employees engaged in similar conduct to the plaintiff and went undisciplined. *Graham v. Long Island R.R.*, 230 F. 3d 34, 39 (2d Cir. 2000); *see also Radwan v. Manuel*, 55 F. 4th 101, 132 (2d Cir. 2022).  Nomura does not dispute the first prong, only the second.  Plaintiff has shown that Polgul received no disciplinary action nor were his time swipes pulled despite having similar violations of Nomura's attendance policy.

**A.    Plaintiff Has Established a Prima Facie Case of Discrimination Under Title VII, the NYSHRL, and NYCHRL**

Plaintiff has provided sufficient evidence to meet her burden based upon the fact that (a) Nomura never pulled Polgul's in-office time sheets or "swipes,"; and (b) she was disparately treated based upon the available evidence when compared to Polgul.  As such, Plaintiff has met her burden of establishing a prima facie case, as discussed below.

First, there are no in-office "swipe" records for Polgul, Ms. Feng's fellow junior quant, for the entire month of October of 2022.  Though there is testimony regarding his limited time in the office, Nomura has not and cannot produce his in-office swipes for the month of October 2022, if he were in at all. (PSOF ¶ 172).  The reason is because Polgul's October "swipes" were never pulled on January 10, 2023 (the first time Nomura attempted to pull Ms. Feng's "swipes") nor on February 10, 2023 (the second time Nomura pulled Ms. Feng's "swipes") (Stanzl Dep., p. 111:7 – 112:6).  Furthermore, Anthony didn't pull any other one of his employee's swipes from October 2022 on other than Ms. Feng's.  (Muchnik, p. 175:12-176:8).  Notably, the Fair Labor Standards Act requires employers to retain basic time and earnings cards or sheets for a period of 2 years.  29 U.S.C. § 211c.  This lawsuit was commenced and discovery began before the two-year required period of retention expired.  However, Nomura has not produced any time records, sheets or "swipes" to indicate Polgul's presence in the office in October 2022.

The available evidence demonstrates that Herzig requested Ms. Feng's swipes on January 10, 2023. (Gerrald Decl., Ex. LL) Polgul was out of the office for five (5) straight required in-office days. (Gerrald Decl., Ex. MM)  In fact, when faced with a question regarding Polgul's five (5) straight days of out of office time for January 4th, 5th, 10th, 11th, and 12th, Stanzl (Polgul and Ms. Feng's direct supervisor) stated that such a period of unexplained time out of the office was not an issue and had no impact on Polgul's end of year review or year-end bonus, nor was any

9

disciplinary action required. (Stanzl Dep., p. 112:11-113:25).  Despite her similar attendance record with Polgul's, Ms. Feng had her swipes pulled, received a poor performance review, a decrease in her bonus, and was ultimately terminated.  Stanzl's shift in justifying the periods of unexplained absences gives rise to an inference of discrimination.  *Belfi v. Prendergast*, 191 F.3d 129, 139 (2d Cir. 1999) ("Examining these shifts in justification, a jury could reasonably infer discrimination from the selective enforcement of the employer's policy.").

Furthermore, a review of the available evidence establishes the disparate treatment by Ms. Feng's supervisors.  Nomura sets forth the time frame of October 4, 2022 to February 13, 2023 since that was the date Herzig pulled Ms. Feng's swipes for a **second** time[2]. (Gerrald Decl., Ex. LL).  However since Polgul's October 2022 "swipes" were never pulled by Herzig at any point, the available evidence establishes that during the time period of November 1, 2022 to February 13, 2023, the Plaintiff was out of office for an unexplained reason, i.e. she did not send an email or inform a supervisor, for a total of four (4) days.  PSOF ¶¶ 175; 307).  In contrast, Polgul was absent for unexplained reasons from the office for a total of seven (7) days. (Murphy Decl., Ex. GG).  Anthony testified that no disciplinary action was taken against any other employee for missing an in-office day, even though some took off days for poor air quality, picking up someone from the airport.  (Anthony Dep., p. 176:19-177:9).  While much of the concern for Anthony revolved around Ms. Feng's out-of-office days, no focus was on the amount of hours Ms. Feng worked remotely, nor the fact that she had to work outside of normal business hours, despite Anthony noting that he was getting emails after midnight from Plaintiff during her remote hours.  (Gerrald Decl., Ex. NN) & Plaintiff II, p. 415:23-417:6; p 418:2-5) Despite Ms. Feng having three less unexplained out-of-office days, Nomura took the following adverse

---

[2] Herzig also pulled Ms. Feng's in-office swipes on January 10, 2023.  At that time, from November 1, 2022, Polgul had (4) total unexplained absences and Ms. Feng had five (5) total unexplained absences.  Again, Polgul's swipes were not pulled or requested despite the similar violations of the in-office policy.

actions against Ms. Feng: (a)  Herzig pulled her swipes in February (Gerrald Decl., Ex. LL); (b) Stanzl and Anthony determined that her absences would reflect negatively on her performance review and ultimately provided Ms. Feng with a "partially meets expectations" grading (Murphy Decl, Ex. SS & Anthony Dep., p. 185:3-22); and (c) Anthony determined that her absences would substantially reduce her bonus (Anthony Dep., p.280:7-8).  In contrast, no disciplinary action was taken against Polgul notwithstanding that he had three (3) more unexplained absences.

The record presents a triable issue of fact with respect to whether the disparate discipline was motivated by discrimination, in view of: (a) Anthony and Herzig never requesting Polgul's swipes despite the similar attendance issues; (b) Ms. Feng's review and bonus were severely adversely impacted due to the absences while no disciplinary actions whatsoever were taken against Polgul; and Ms. Feng was ultimately terminated.  *Dotson v. City of Syracuse*, 763 Fed. Appx. 39, 43 (2d Cir. 2019) (finding that an employer's disparate discipline that stemmed from a supervisors unusually (and suspiciously) harsh recommendation, created a triable issue of fact as to whether such recommendation was motivated by discrimination against women).

### B.      The Proffered Non-Discriminatory Reason for Ms. Feng's Termination is Pretextual

Plaintiff has established that Nomura's proffered legitimate non-discriminatory reason for her termination as a reduction in force was pretextual in that the record makes clear that: (a) after Ms. Feng's termination, Nomura expanded the EDO (PSFO ¶¶ 296-300); (b) after Ms. Feng's termination, Nomura hired or transferred only males into the EDO to conduct the work Ms. Feng had previously done (Id.); (c) Stanzl's testimony with respect to Ms. Feng's performance review is inherently contradictory; and (d) following her complaint against Roy, her supervisors deprioritized her work leading to data issues that culminated in a sham "partially meets

11

expectations" end of year review.  Each of these factors, as further discussed below presents a triable issue of fact and demonstrates Nomura's failure to prove that there is no evidentiary route that could allow a jury to believe that discrimination played a role in their challenged actions. *Lefort v. Kingsbrook Jewish Med. Ctr.*, 203 A.D. 708, 712 (2d Dep't. 2022).  Here, careful scrutiny of Nomura's actions following Ms. Feng's second complaint of discrimination reveals circumstantial evidence supporting an inference of discrimination, and therefore, summary judgment should be denied.  *Belfi*, 191 F.3d 129, at 135 ("We have emphasized that the trial court must be especially cautious in deciding whether to grant this drastic provisional remedy in a discrimination case, because the employer's intent is often at issue and careful scrutiny may reveal circumstantial evidence supporting an inference of discrimination.").

1. **Nomura's Expansion of the EDO Through the Hiring and Transferring of Male Employees into the EDO After Ms. Feng's Termination Gives Rise to Discrimination**

To begin with, Plaintiff was the only female in her group[3].  (PSOF ¶ 78)  Also, the general composition of employees showed that it was male dominated.  Nancy Prahofer ("Prahofer"), Nomura's managing director of their legal department, explained the internal make up of Nomura with respect to certain employment positions and the genders who occupied them, identifying the overwhelmingly disparate ratio of women to male employees at Nomura. (Prahofer Dep., p.8:11-9:15 & p. 36:5-37:7). They are as follows:

| EMPLOYMENT POSITION | RATIO OF FEMALES TO MALES |
|---|---|
| Managing Directors | 2 females to 23 males |
| Executive Directors | 3 females to 24 males |
| Vice Presidents | 2 females to 14 males |

---

[3] Notably Nomura's European affiliate, Nomura International plc ("Nomura EMEA"), disclosed that in 2022 men were paid substantially more than women, and after failing to meet its goal of having 19% female representation in senior management position, Nomura EMEA reduced its goal target to 17% of female representation.

| Associates | 2 females to 7 males |
|---|---|
| Analysts | 1 female to 1 male |

(Prahofer Dep., p. 36:5-37:7 & Gerrald Decl., Ex. OO)

Following her termination allegedly due to a "reduction in force", Nomura hired a new male analyst and subsequently internally transferred two additional male members into the EDO. (PSOF ¶ 296-300)  (Gerrald Decl., Ex. PP).  Within three months of Plaintiff's termination the EDO had more members than it did when Plaintiff worked there, and within a year, the EDO had expanded to a total of nine members, each of which were males. *Id*.  Significantly, Yu Qing Xia ("Xia"), a male who was transferred into the EDO as a Vice President following Plaintiff's termination, was paid a hire salary than Ms. Feng.  (PSOF ¶ 296).  The hiring of male employees to replace Ms. Feng gives rise to an inference of discrimination.  *Littlejohn v. City of New York*, 795 F. 3d 297, 312-13 (2d Cir. 2015)(holding "an inference of discrimination also arises when an employer replaces a terminated or demoted employee with an individual outside the employee's protected class."); *See also Conforti v. Sunbelt Rentals, Inc.*, 201 F. Supp 3d 278, 298 (E.D.N.Y. 2016) ("The Second Circuit has stated that '[t]he fact a plaintiff was replaced by someone outside the protected class will ordinarily suffice for the required inference of discrimination at the initial prima facie stage of the Title VII analysis, including at the pleading stage."); *Osekavage v. Sam's East, Inc.*, 619 F. Supp 3d 379, 392 (S.D.N.Y. 2022)(finding that the legitimate, non-discriminatory reason could be viewed as pretextual because, among other things, "Defendants replaced [female plaintiff] with a male Club Manager").

13

In addition to the hiring of male employees to replace Ms. Feng, the evidence also establishes a pattern of discriminatory and disparate treatment towards Ms. Feng leading up to her termination.

        2.      **The Comments in Ms. Feng's Performance Review Regarding Data Issues Are Contradicted by Stanzl's Testimony and Such Contradictions Give Rise to an Inference of Discrimination**

In response to her discrimination complaint about Anthony in October, Anthony removed Ms. Feng from the weekly IT meetings, despite Ms. Feng asking not to be isolated. (PSOF ¶ 115) As a result, Ms. Feng's direct line of communication to address data issues in an in-person meeting was removed, and only Stanzl and Anthony would attend the IT meetings.  (PSOF ¶ 118-119; 151).  However, despite Stanzl and Anthony's presence in these weekly IT meetings, Stanzl and Anthony never addressed Ms. Feng's data issues during them, despite, as the record shows having knowledge of the issues and Stanzl labeling quant work as "the highest priority," and such meetings were to address high priority issues. (PSOF ¶ 318).  Instead, Stanzl used the data issues as a springboard to Ms. Feng's "partially meets expectations" review.  However, the contradictions contained in Stanzl's testimony and his comments in the performance review implicate triable issues of fact in which a juror could determine that the proffered reason is simply pretextual for discrimination.

Stanzl claimed that it was Plaintiff's failure to address data issues that resulted in a delay with her Earnings Volatility Model. (PSOF ¶ 233).  Yet his testimony established that Ms. Feng continuously followed up regarding her data issues, not only to individual members of the IT team, but escalating to her direct supervisor, Stanzl, and her manager, Anthony, each of whom were in weekly meetings with IT.  (Stanzl Dep., p. 93:23—99:13)

Rather, and despite: (a) Stanzl acknowledging that Roy and his team controlled the data giving rise to Ms. Feng's IT issues (PSOF ¶ 90; 319);(b) Stanzl and Anthony being present in the

14

IT meetings (PSOF ¶ 119); (c) Stanzl acknowledging that he had direct access to the IT team in weekly meetings (PSOF ¶ 318); (d) Plaintiff emailing Stanzl, Anthony, and IT to address the data issues (PSOF ¶ 318); (e) Plaintiff creating JIRA tickets to address the data issues in line with company policy (PSOF ¶ 318); and (f) Stanzl acknowledging that quant work is the "highest priority" in these weekly meetings (PSOF ¶ 318), neither Stanzl nor Anthony discussed the data issues Ms. Feng brought to their attention in the IT meetings, and instead, placed the blame on Plaintiff in her year-end review. (PSOF ¶ 318) In fact, Stanzl could not explain how he even told Ms. Feng to escalate the seriousness of her IT issues to her superiors when pressed on what else Ms. Feng could do. (Stanzel, p. 93:2-94:9). Such shifting justifications to support his contradictory performance review could lead a reasonable juror to find that discriminatory intent lies beneath the poor performance review, given Stanzl and Anthony's easy access to IT. Ms. Feng's emails regarding her IT issues and discussions with her supervisors escalating her concerns, contradicts Stanzl's testimony and comments in the performance review give rise to a triable issue of fact. *Belfi*, 191 F.3d 129, at 139 (holding that the employer's shifting justifications could lead a jury to reasonably infer discrimination.).

### 3.    The Poor Performance Review was the Culmination of a Pattern of Discrimination

Anthony testified that Ms. Feng's poor performance was a factor in their determination to terminate her. (Anthony Dep., p. 117:20-118:2). However, neither poor performance nor excessive absences were cited to Plaintiff as reasons for her termination. (Herzig Decl., Ex. B). Rather, as Anthony stated, the talking points he specifically used stated that this was a "not a for cause termination." (Herzig Decl., Ex. B; & Anthony Dep., p. 68:7-12). Nor did any of the additional paperwork indicate that performance or absences had anything to do with her termination, rather each referred to Ms. Feng's termination as a redundancy or reduction in force.

15

(Gerrald Decl., Ex. CC, Ex.DD).  While at first glance, such a comment may not seem out of the ordinary, in the context of the entirety of the evidentiary record, these comments begin to pull back the curtain on the pattern of discriminatory treatment of Ms. Feng.

It is clear that Anthony, when joining the EDO, did not have any knowledge of the innerworkings or substantive aspect of employment for the members of the EDO (Gerrald Decl., Ex. UU).  That is evident by his request to have Muchnik perform the mid-year review in October of 2022 when Anthony became head of the team. (*Id*.).

Equally clear is that when Anthony first learned of Ms. Feng's complaint in October about Roy, he did not have knowledge of the prior history between Ms. Feng and Roy from February of 2022, as he admitted such in his correspondence with Peter Lambert.  (Gerrald Decl., Ex. QQ).  However, about two days before his return to office, Stanzl reached out to Anthony to inform him that Roy was upset by Ms. Feng's emails.  (Gerrald Decl., Ex. FF).  Roy was more senior than Ms. Feng and was the head of the data department that impacted EDO projects.  (PSOF ¶ 90).  Despite not having enough substantive information to conduct a review two weeks prior, Anthony began drafting written expectations for Plaintiff only after learning Roy was upset with her and after returning from vacation.  (Anthony Dep., p. 196:8-21).  By the time Anthony began drafting these written expectations for the sole female employee, he had been in office and managing the EDO for only three weeks (excluding his vacation).  Ms. Feng was the only one who had written expectations developed for her, despite receiving a "on track" performance evaluation in October.  (Anthony Dep., p. 198:6-9).

Anthony was in the process of drafting these written expectations, when Ms. Feng requested time off due to medical procedures she was scheduled to have.  Ms. Feng asked for the time off on November 14, 2022.  (Gerrald Decl., Ex. II).  Tellingly, before even responding to

16

Plaintiff, Anthony forwarded Ms. Feng's email to Herzig in Human Resources and asked what he could do if this becomes a "theme." (Gerrald Decl., Ex. JJ)

When faced with this unambiguous language, Anthony testified this was his way of seeking some sort of "accommodation". (Anthony Dep., p. 181:24-182:12). However, he neither used the word accommodation in his email to Herzig, nor does he suggest any accommodation to Plaintiff. (Gerrald Decl., Ex. JJ). Instead, Anthony adversely characterized Ms. Feng's medical procedures and appointments as a "theme." (*Id.*). Yet, Polgul's five straight days of violating the "in-office" policy was not even questioned by Human Resources, Anthony, or Stanzl, nor was it described as a "theme."

From the moment Roy informed Stanzl and Anthony that he was frustrated with Ms. Feng, the criticisms and critiques of Ms. Feng increased, the senior members of her group (Roy, Stanzl and Anthony) deprioritized the issues she was facing with data in the IT meetings, and disparately applied the attendance policy against her only, as evidenced by never pulling swipes for any other employee. Taken together, such contradictions by Stanzl coupled with the disparate treatment regarding Ms. Feng's absences can lead a reasonable juror to believe that the non-discriminatory reason offered for termination was pretextual. *Osekavage*, 619 F. Supp. 3d, at 379 (holding that evidence that similar employees committed similar offenses and were disciplined less severely than the plaintiff as well as the replacement of the female employee with male employees, collectively gave rise to an inference that the non-discriminatory reason offered for termination was pretextual).

17

III.    **PLAINTIFF'S CLAIMS OF GENDER BASED DISCRIMINATION IN COUNTS IV AND IX FOR VIOLATIONS OF THE FEDERAL EQUAL PAY ACT AND THE NYS EQUAL PAY ACT, SHOULD NOT BE <u>DISMISSED</u>**

A.    **Ms. Feng and Polgul Performed Equal Work on Jobs Requiring Equal Skill, Effort, and Responsibility**

To prove a violation of the Equal Pay Act ("EPA"), a plaintiff first must establish a prima facie case of discrimination by showing: "'(i) the employer pays different wages to employees of the opposite sex; (ii) the employees perform equal work on jobs requiring equal skill, effort, and responsibility; and (iii) the jobs are performed under similar working conditions.'" *Belfi*, 191 F.3d at 135 (internal citations omitted).

Nomura has admitted that it pays different wages to employees of the opposite sex. Herzig recommended that Plaintiff's pay should be increased because of "gender pay equity" and Anthony testified that the recommendation was to increase Ms. Feng's compensation to "bring up the minimum/gender pay equity" (Gerrald Decl., Ex. L; & Herzig Dep., p. 155:21-156:3; 184:22-185:24 & Anthony Dep., p. 94:3-99:21). Nomura also concedes the first and third prongs in that it paid different wages to employees of the opposite sex of Plaintiff, and the jobs Plaintiff and Polgul performed were performed under similar working conditions, limiting its opposition to the second prong.

In order to meet the second prong, Plaintiff must show that the work performed by Polgul and Plaintiff were sufficiently similar "to support at least a minimal inference that the difference of treatment may be attributable to discrimination." *Downes v. JP Morgan Chase & Co*, 2006 U.S. Dist. LEXIS 13582, at *75 (S.D.N.Y. Mar. 21, 2006). Plaintiff has met her burden by providing evidence that Ms. Feng and Polgul performed similar functions, reported to the same supervisor, the bulk of their work was based on building statistical models, and each had similar responsibilities and projects.

18

Nomura arguments regarding Polgul and Ms. Feng holding different job titles is unavailing. Not only are similar job titles insufficient to prove similar work performed, but the Second Circuit has also made it clear that "job content and not job title or description" is "the central concern of an EPA claim." *EEOC v. Port Auth. Of N.Y. & N.J.*, 768 F.3d 247, 255 (2d Cir. 2014) (quoting *Tomka v. Seiler Corporation*, 66 F.3d 1295, 1310 (2d Cir. 1995)).

Anthony, despite initially claiming that Polgul performed some different functions, ultimately agreed that: (a) the primary job for Polgul and Ms. Feng was to build statistical models (PSOF ¶ 84); (b) Polgul and Ms. Feng were both junior quants (PSOF ¶ 80); and (3) both Ms. Feng and Plaintiff reported to the same supervisor. The fact that the two performed some different tasks but the bulk of the work was devoted to the building of statistical models stands for the proposition that the Plaintiff and Polgul performed equal work. *Mazzella v. RCA Global Communications, Inc.*, 642 F. Supp. 1531, 1550 (S.D.N.Y. 1986) ("Nonetheless, like [plaintiff], [comparator] was expected to devote the bulk of his work efforts to recruiting. Thus, despite the fact that [plaintiff] had some responsibilities that [comparator] did not, and vice versa, I find that the two positions were essentially the same.")

Furthermore, Muchnik's testimony as a quant and former supervisor of both Plaintiff and Polgul is further illuminating regarding the similarities in the work performed. Muchnik first established that Stanzl, Ms. Feng and Polgul were each designated as quants and worked on the data analytics side. (PSOF ¶¶ 33, 42; Muchnik, p. 35:10-36:7). Muchnik also indicated that Polgul and Plaintiff were "junior quants" and Stanzl was a more "senior quant." (Muchnik, p. 56:18-57:2). Specifically, Muchnik stated that a senior quant takes on more responsibilities than a junior quant, like Plaintiff and Polgul. (PSOF ¶ 33 & Muchnik, p.65:17-66:4). Furthermore, the record evidence establishes that Ms. Feng and Polgul carried the same work load

19

responsibilities, as evidenced by Stanzl and Muchnik's workflow emails showing Polgul and Ms. Feng carrying the same amount of projects (Gerrald Decl., Ex. RR & QQ). Additionally, Muchnik noted that at one point he oversaw quants who worked on pricing models and quants who worked on statistical models. (PSOF ¶ 87). Neither Ms. Feng nor Polgul worked on pricing models. Rather, Polgul and Ms. Feng each worked on the statistical models as the bulk of their work evidencing the similarities in the job content performed. *Mazzella*, 642 F. Supp., at 1550.

The evidentiary record establishes that Polgul and Plaintiff each reported to the same supervisor, each built statistical models, each performed work and research on the data analytics side, and each were junior quants holding equal responsibilities. Such similarities have been found to be sufficient to establish a prima facie case. *Downes*, 2006 U.S. Dist. LEXIS 13582, at *97-80 (finding that the fact the comparators and plaintiff each reported to the same person, shared overlapping responsibilities, the equivalence of their rank supported a finding that they are "'substantially equal in skill, effort, and responsibility.'" (internal citations omitted)).

### B. Nomura's Proffered Factor Other Than Sex Defense Is Unsupported and Contradicted, Raising Triable Issues of Fact.

Lastly, having established a prima facie case, the burden shifts to the Defendant to provide a legitimate affirmative defense under the EPA. *Belfi,* 191 F. 3d 129, *at 136.* As such, Nomura has set forth that the pay discrepancy was due to the fact that Polgul had more experience in the Vice President role and received a more favorable performance review than Plaintiff in the fiscal year of 2023. The proffered affirmative defense is unavailing.

First, with respect to the performance review, Plaintiff has established in Section II (B)(2) above, and Section IV (A), below, that the performance reviews were the product of discriminatory and retaliatory intent aimed at the sole female employee within the EDO. The pattern of adverse actions taken against Plaintiff by Stanzl, Anthony and Roy, ultimately resulted

in them placing contradictory and pretextual comments in her performance review that are debunked by the record.  Therefore, the "poor" performance review is a pretextual reason for termination.

In addition,  Nomura asserts, without any factual foundation, that Polgul had more experience in the Vice President ("VP") role.  His prior experience involved other work at various financial institutions.  (PSOF ¶ 69-70).  However, while Nomura proclaims that Polgul had more experience as a VP, the record is bereft of any direct evidence that the work performed by Polgul at his prior places of employment was similar to what his current position, rather, the record only contains vague and conclusory statements from Nomura's representatives.  As such, Nomura has not established a connection to his prior employment and his work at Nomura.  *Moll v. Telesector Res. Grp., Inc.*, 94 F. 4th 218, 258 (2d Cir. 2024) (holding that an employer must prove that the prior experience is a job-related qualification, otherwise without such a requirement, the "'factor-other-than-sex defense would provide a gaping loophole in the [EPA]' through which many post hoc excuses for discrimination 'would be sanctioned'") (*quoting Aldrich v. Randolph Cent. School Dist.*, 963 F.2d 520, 525 (2d. Cir. 1992).  Nor did Polgul's prior experience place him in a position of greater responsibility, Ms. Feng and Polgul each carried the same workload.  (Gerrald Decl., Ex. RR & QQ)  Such evidence lends further credence to the similarities of the work responsibilities of Polgul and Ms. Feng and further demonstrates that Polgul's experience from his prior positions outside of Nomura did not increase his level of responsibilities or impact his requirements in his new position.  Viewing the evidence in the light most favorable to the non-moving party, a reasonable juror could determine that such "experience" arguments are pretextual.

21

IV.     **PLAINTIFF'S CLAIMS OF RETALIATION SHOULD NOT BE DISMISSED**

The analysis performed for a Title VII retaliation claim follows the familiar three-part *McDonnell Douglas* burden shifting framework. *Giscombe v. New York City Dep't of Educ.*, 39 F. Supp. 3d 396, 400 (S.D.N.Y. 2014). A review of the entirety of the evidentiary records establishes that plaintiff has both set forth a prima facie case of retaliation under Title VII and has sufficiently provided evidence of a retaliatory motive for her termination, given the persistent deprioritization of Plaintiff's work following her reporting of discrimination and requests for sick leave.

A.     **The Causal Connection is Established Based on the Series of Antagonism and Deprioritization Leading to Ms. Feng's Performance Review**

The deprioritization of Plaintiff's work is sufficiently detailed in Section II (B)(2), *supra*. In addition to Stanzl and Anthony blatantly ignoring Ms. Feng's requests for assistance, the comments and actions of the members involved in Ms. Feng's 2023 performance review and ultimate termination gives rise to a retaliatory intent. The record establishes that Stanzl and Anthony were alerted that Roy was upset with Ms. Feng's emails stating her complaints against him and highlighting certain data issues. (Gerrald Decl., Ex. FF). After becoming aware of this issue, Anthony, rather than further investigating or communicating with Human Resources or Ms. Feng regarding Roy's annoyance with Ms. Feng, began drafting expectations exclusive for Ms. Feng, despite telling her that her job requirements would be unchanged. (Gerrald Decl., Ex. JJ)

Furthermore, and equally telling is Anthony's email to Herzig on November 14, 2022. (Gerrald Decl., Ex. JJ). Within days of being informed Roy was upset with the Plaintiff, and within 2 weeks of returning from vacation, Anthony received an email from Ms. Feng requesting a day off. (*Id.*). Rather than responding to Ms. Feng, Anthony immediately (within five (5)

22

minutes) forwarded the email to Herzig and asked what he can do if this becomes a "theme." (*Id.*). While Anthony claims that such email was his way of determining what "accommodation" he could offer Ms. Feng, the word accommodation is absent from this email, but instead the word used is "theme." (Gerrald Decl., Ex. JJ). Furthermore, almost every time Ms. Feng requested time off after Anthony took over and after Plaintiff's complaint in October, she was met with a response from Anthony indicating that she needed to reschedule her appointments or come into the office. In contrast is Anthony's response to Yanni Kostalas regarding a sick day taken, where rather than reprimanding Yanni, Anthony essentially told him to take all the time he needs. (Gerrald Decl., Ex. XX).

Finally, and consistent with the antagonistic approach Nomura took against Ms. Feng, Herzig's actions confirm the retaliatory intent behind Plaintiff's termination. First, after Ms. Feng filed her retaliation complaint against Anthony, Herzig messages her colleague, Lindsay Thorvaldsen, that Ms. Feng needed to reschedule their meeting. (PSOF ¶ 253). In this chat, Herzig ridiculed Ms. Feng for rescheduling, stating "I'm dumb founded" and "As long as I am engaging with her and making myself available, she can't say that we are ignoring her complaint." (PSOF ¶ 253, (Gerrald Decl., Ex. AA). The day after making these comments, Herzig sent an email to Ms. Feng informing her that she was canceling their scheduled meeting to discuss the retaliation complaint. (PSOF ¶ 256; Gerrald Decl., Ex. SS). In that email, Herzig claimed to have conducted an investigation, but in fact only reviewed the comments to the performance review and made a self-serving determination that the investigation should be closed. (Gerrald Decl., Ex. SS.). In fact, Herzig did not interview anyone, did not assign a Grievance Manager, as required by Nomura's Handbook. (Murphy Decl. Ex I). Instead, she simply unilaterally made her determination without taking any investigatory actions. *Owens v.*

*Circassia Pharms., Inc.*, 33 F. 4th 814, 828-829 (5th Cir. 2022) ("An employer's investigatory choices might, depending on the facts of a particular case, be suspicious in a way that renders the 'defendant's explanation…unworthy of credence' and permits an inference of discrimination)(internal citations omitted).

Prior to Ms. Feng's second complaint against Roy, Ms. Feng had never received a below "meets satisfaction" rating. However, following her complaint and the revelation that a senior member of the IT team (a team Anthony must rely on) was upset by Ms. Feng's complaint, Plaintiff was targeted by Anthony, as discussed above. Such a course of conduct against Ms. Feng following her second complaint establishes the causal connection between the adverse action and the protected activity. *Chan v. NYU Downtown Hosp*., 2004 U.S. Dist. LEXIS 1419, at *9 (S.D.N.Y. 2004). (holding that a pattern of antagonism between the complainant and her employer can support a causal connection to her complaint of discrimination and the retaliatory action.); *See also Kachmar v. SunGard Data Systems, Inc.,* 109 F.3d 173, 177 (3d Cir. 1997) (holding that a "pattern of antagonism" following the protected conduct will suffice for causation in the absence of temporal proximity).

**B.      Nomura's Proffered Non-Retaliatory Legitimate Reason Is Undermined by the Actions of Anthony, Roy and Stanzl following her Complaints**

Plaintiff's first and only "partially meets expectations" performance review occurred only after Stanzl and Anthony were informed that Roy was upset. Close scrutiny of the events after the October 18 Incident demonstrates that Stanzl, Roy and Anthony each retaliated against Ms. Feng, ultimately leading to a sham performance review labeling her as "partially meets expectations." The evidence regarding actions taken after her second discrimination complaint against Roy, could lead a reasonable juror to determine that Anthony was lying in wait and used the negative performance reviews as a paper trail and smoke screens for Nomura's retaliatory

24

actions during the first opportunity that presented itself. *Bucalo v. Shelter Island Union Free School Dist.*, 691 F.3d 119, 131 (2d Cir. 2012) (noting the district court did not err in submitting the case to the jury despite the four-year gap between adverse action because the district court found that the defendant took adverse action "on its first opportunity to do so.")

The Second Circuit's decision in *Curcio v. Roosevelt Union Free Sch. Dist.*, 2012 U.S. Dist. LEXIS 120144 (E.D.N.Y. Aug. 22, 2012) is instructive. . In *Curcio*, the defendants argued that the retaliation claim must be dismissed as a matter of law due to the lack of temporal proximity between the service of plaintiff's EEOC complaint and the defendant's recommendation against tenure. *Id*. at *41. Plaintiff, however, argued that the defendants provided plaintiff with declining performance reviews to develop the paper trail to justify their decision. *Id.* Since the defendants became overly critical after the complaint, in that the defendant began to criticize the plaintiff's lack of attendance at district functions, there were overreactions to clerical errors and that the defendants singled the plaintiff out and treated him differently for this criticism than the defendants treated his colleagues, the court in *Curcio* denied defendant's summary judgment motion as there were issues of fact present as to the causal connection between the adverse action and the protected activity. *Id.* at 46-47. Similarly, the record at bar presents triable issues of fact militating in favor of the denial of summary judgment on the retaliation claim.

The events that unfolded after Ms. Feng made her second discrimination complaint against Roy, when viewed collectively, demonstrates that Nomura was waiting to take its adverse action at its first opportunity, the March 2023 end of year review. Drawing all inferences in favor of the non-moving party - i.e. Plaintiff -, the record establishes the following:

(i)     Ms. Feng made her second complaint against Roy on October 18, 2022, and formally put her complaint on record on November 16, 2022; (PSOF ¶ 104)

25

(ii)     Roy was senior in terms of employment status to Ms. Feng (PSOF ¶ 90);

(iii)    as a "resolution" to her complaint, Ms. Feng was removed from the weekly IT meetings (PSOF ¶ 119);

(iv)     Anthony learned that Roy was upset with Ms. Feng's complaint from Stanzl on October 30, 2022 (Gerrald Decl., Ex. FF);

(v)      Ms. Feng received an "on track" review in October 2022 (Feng Decl. at ¶ 77);

(vi)     Ms. Feng alerted her supervisors and the IT team to data issues via email to IT, JIRA tickets, emails cc'ing her direct supervisor Stanzl and her overall supervisor, Anthony (PSOF 318 & Gerrald Decl. Decl. Ex. (Stanzl Dep., 95: 12-20);

(vii)    Stanzl did not address Ms. Feng's data issues in the weekly IT meetings (Stanzl Dep., p. 95: 12-20);

(viii)   Anthony wrote written expectations for only Ms. Feng, following his discovery that Roy was upset by the complaint (Gerrald Decl., Ex. GG);

(ix)     When Ms. Feng requested a day off for her medical procedures in November of 2022, Anthony immediately (within five minutes of receipt) emailed Herzig to see what he could do if this becomes a "theme" (Gerrald Decl., Ex JJ);

(x)      Anthony asked to pull Ms. Feng's in-office swipes on two occasions, but never pulled any male employee's in-office swipes(Gerrald Decl., Ex. LL.;

(xi)     Anthony did not offer any sort of accommodation to Ms. Feng for her medical appointments, despite testifying that was his goal (Anthony Dep., p. 181:24-182:12);

(xii)    Anthony told Ms. Feng she needs to schedule her medical appointments and procedures on non-in-office days (PSOF 186);

(xiii)   Anthony and Stanzl drafted Ms. Feng's performance review (Gerrald Decl., Ex. Z); and

(xiv)    culminated with Herzig sending an email that there was already a plan to terminate Ms. Feng despite the reduction in force (Gerrald Decl., TT).

Furthermore, the evidentiary record shows that Nomura was building a case to terminate Ms. Feng following her complaints for retaliation and discrimination. While routinely acknowledging that Ms. Feng was a shy individual and needed to speak up in her performance

26

reviews, the descriptions of Ms. Feng abruptly changed following the above which is evident in Herzig's June 29, 2023 email.  (Gerrald Decl., Ex TT).  Herzig asserted that Ms. Feng was now exhibiting disruptive behavior because of her review(Gerrald Decl., Ex. TT).  Herzig was also the individual who revised an email from Anthony because it was "too positive/affirmative in her success.") (PSOF ¶ 225).  The pattern outlined above, coupled with Stanzl's contradictory assertions for termination could lead, as the Court determined in *Curcio*, "a reasonable juror [to] find that the escalating criticisms and negative performance reviews," ultimately culminating in Ms. Feng's poor performance review and termination, "were motivated at least in part by retaliation for plaintiff's discrimination complaint." *Curcio*, 2012 U.S. Dist. LEXIS 120144, at *49-50.  As such, summary judgment should be denied.

    **C.**       **Ms. Feng's Retaliation Complaint Against Anthony is a Viable Complaint**

Lastly, Ms. Feng's claim against Anthony for interference with her sick leave is a viable complaint.  Keeping in mind the discriminatory pattern referenced above, on numerous occasions when Ms. Feng would advise Anthony of a doctor's appointment or a procedure, Anthony would reply that her appointments should be scheduled on Mondays or Thursdays, or that she should come into the office after her tests. (PSOF ¶ 195-196).  Such interference with Plaintiff's ability to schedule doctor's appointments around the doctor's schedule is a clear interference with her ability to take protected time off.  *Kemp v. Regeneron Pharms, Inc.*, 117 F. 4th 63 (2d Cir. 2024) (holding that an employers attempts to discourage employee from taking FMLA leave and the limitations the employer put on employees remote work time interfered with her rights under FMLA).  The fact that Ms. Feng complained to Herzig in Human Resources regarding the acts of Anthony qualifies as general corporate knowledge. (PSOF ¶ 246)  *Triola v. Snow*, 289 Fed. Appx. 414, 417 (2d Cir 2008) ("the knowledge element is satisfied when a plaintiff has 'complaint directly' to another employee 'whose job it was to investigate and resolve such

27

complaint'")(internal citations omitted). Finally, the fact that Ms. Feng ultimately withdrew her formal complaint to Human Resources is not fatal to her claim of retaliation. *Sherman v. County of Suffolk*, 71 F. Supp. 3d 332 (E.D.N.Y. 2014) (holding that the plaintiff's conditional withdrawal of an internal complaint did not bar plaintiff's ability to file suit for retaliation.). Therefore, the record evidence establishes that Ms. Feng engaged in a protected activity, her employer was aware of the activity, Ms. Feng suffered a materially adverse employment action, and there was a causal connection given the pattern and evidence of retaliatory action following her complaint.

Accordingly, in view of the demonstrable triable issues of fact, summary judgment should be denied as to Plaintiff's retaliation claims.

## CONCLUSION

For the reasons set forth, above Plaintiff respectfully submits that the motion for summary judgment dismissing the complaint must be denied in its entirety.

Respectfully submitted,
McLaughlin & Stern, LLP

By:   *Steven J. Hyman*
Steven J. Hyman, Esq.
Jacqueline C. Gerrald, Esq.
McLaughlin & Stern, LLP
260 Madison Avenue, 16th Floor
New York, New York 10016
Phone: (212) 448-1100
Fax: (212) 448-0066
E-mail: shyman@mclaughlinstern.com
E-mail: jgerrald@mclaughlinstern.com
*Attorneys for Plaintiff Xue (Heidi) Feng*

Dated:  New York, New York
        June 5, 2026

28

## WORD COUNT CERTIFICATION

The undersigned attorney hereby certifies that this document complies with the word count limitation of Local Rule 7.1 because it contains 8,723 words, excluding the caption, any index, table of contents, table of authorities, signature blocks, and certificates.

*Steven J. Hyman*
Steven J. Hyman, Esq.